STATE OF NORTH CAROLINA v. BARBARA T. STAGER

No. 212A89

(Filed 14 August 1991)

**1. Criminal Law § 34.4 (NCI3d) — similar crime — when admissible**

Evidence is admissible under Rule 404(b) of the N. C. Rules of Evidence if it is substantial evidence tending to support a reasonable finding *by the jury* that the defendant committed a similar act or crime and its probative value is not limited solely to tending to establish the defendant's propensity to commit a crime such as the crime charged.

**Am Jur 2d, Evidence §§ 320 et seq.**

**2. Criminal Law § 34.4 (NCI3d) — similar crime — when admissible**

Under Rule 404(b) a prior act or crime is "similar" if there are some unusual facts present in both crimes or particularly similar acts which would indicate that the same person committed both. It is not necessary that the similarities between the two situations rise to the level of the unique and bizarre; rather, the similarities simply must tend to support a reasonable inference that the same person committed both the earlier and later acts.

**Am Jur 2d, Evidence §§ 298, 321.**

**3. Criminal Law § 34.7 (NCI3d) — murder of second husband — circumstances of first husband's death — admissibility to show motive, intent and absence of accident**

In a prosecution of defendant for the first degree murder of her second husband, evidence concerning the death of defendant's first husband was admissible under Rule 404(b) to show motive, intent, preparation, plan, knowledge, or absence of accident where the court found that evidence concerning the death of defendant's first husband, when taken with evidence concerning the second husband's death, tended to show that (1) each of defendant's husbands died as a result of a single gunshot wound; (2) the weapon in each case was a .25 caliber semi-automatic handgun; (3) both weapons were purchased for the defendant's protection; (4) both men were shot in the early morning hours; (5) defendant discovered both victims after their respective shootings; (6) defendant was the last

STATE v. STAGER

[329 N.C. 278 (1991)]

person in the immediate company of both victims; (7) both victims died in the bed that they shared with defendant; and (8) defendant benefited from life insurance proceeds resulting from both deaths.

Am Jur 2d, Evidence §§ 321, 324-326.

4. **Criminal Law § 34.4 (NCI3d)— similar crime ten years before —remoteness—probative value**

The death of defendant's first husband ten years before the death of her second husband was not so remote as to have lost its probative value in a prosecution of defendant for the first degree murder of her second husband.

Am Jur 2d, Evidence § 330.

5. **Criminal Law § 34.4 (NCI3d)— similar crime—twenty witnesses—no abuse of discretion**

The trial court did not abuse its discretion in permitting the State to introduce testimony by twenty witnesses in showing the circumstances of the death of defendant's first husband ten years before the death of her second husband, including testimony from the telephone operator who received the emergency call, rescue squad personnel, employees of insurance companies and the first husband's mother.

Am Jur 2d, Evidence § 333; Trial § 136.

6. **Homicide § 20.1 (NCI3d)— similar crime—photographs of body**

Photographs of the body of defendant's first husband were properly admitted in defendant's trial for the murder of her second husband for the limited purpose of illustrating witnesses' testimony as to where the body was found, the position of the body, and the location of the bullet wound.

Am Jur 2d, Evidence §§ 787, 792.

Admissibility of photograph of corpse in prosecution for homicide or civil action for causing death. 73 ALR2d 769.

7. **Criminal Law § 34.7 (NCI3d)— murder of second husband— death of first husband—probative value outweighing prejudice**

· The trial court did not err in concluding that the probative value of evidence of the circumstances of the death of defendant's first husband ten years earlier outweighed the danger of unfair prejudice in defendant's trial for first degree murder

of her second husband where the evidence was relevant and admissible to show intent, plan, knowledge, and absence of accident. N.C.G.S. § 8C-1, Rule 403.

**Am Jur 2d, Evidence § 330.**

8. **Criminal Law § 95.1 (NCI3d)— evidence competent for restricted purpose—failure to request limiting instruction**

Where defendant failed specifically to request or tender a limiting instruction at the time evidence was admitted, she is not entitled to have the trial court's failure to give a limiting instruction reviewed on appeal. N.C.G.S. § 8C-1, Rule 105.

**Am Jur 2d, Trial §§ 106, 577.**

9. **Criminal Law § 73.3 (NCI3d)— tape recording—admissibility to show state of mind**

In a first degree murder prosecution in which defendant claimed that the shooting of her husband was accidental, a tape recording made by the victim three days before his death was admissible under N.C.G.S. § 8C-1, Rule 803(3) as evidence tending to show the victim's state of mind where the victim's recorded statement tended to show that he was afraid of defendant, tended to disprove the normal, loving relationship that defendant contended existed between the two, tended to refute defendant's contention that the victim would have slept with defendant with a loaded and cocked semi-automatic pistol under his pillow, and thus tended to establish facts directly relevant to the issue of accident.

**Am Jur 2d, Evidence § 436.**

10. **Criminal Law § 70 (NCI3d)— authentication of tape recording**

Under N.C.G.S. § 8C-1, Rule 901, testimony as to accuracy based on personal knowledge is all that is required to authenticate a tape recording, and a recording so authenticated is admissible if it was legally obtained and contains otherwise competent evidence.

**Am Jur 2d, Evidence § 436.**

11. **Criminal Law § 70 (NCI3d)— authentication of tape recording**

The testimony of four witnesses, including a murder victim's parents and sister, that they recognized the voice on a tape recording as that of the victim was sufficient to meet

the State's burden of authentication of the tape recording. Testimony by other witnesses that the voice on the tape was not the victim's went to the weight and credibility of the evidence and not to its admissibility.

**Am Jur 2d, Evidence § 436.**

12. **Constitutional Law § 349 (NCI4th); Criminal Law § 73.3 (NCI3d) — hearsay evidence — state of mind exception — right of confrontation not denied**

   The admission of a tape recording made by a murder victim shortly before his death did not violate defendant's rights to confrontation under the state or federal constitutions where the victim's statement was admissible under the state of mind exception to the hearsay rule.

**Am Jur 2d, Evidence § 436.**

**Admissibility in evidence of sound recording as affected by hearsay and best evidence rules. 58 ALR3d 598.**

**Federal constitutional right to confront witnesses — Supreme Court cases. 98 L. Ed. 2d 1115.**

13. **Criminal Law § 268 (NCI4th) — time to investigate tape recording — denial of continuance — no abuse of discretion**

   The trial court did not abuse its discretion in denying defendant's pretrial and trial motions for continuance of a first degree murder case to give defendant time to make an investigation concerning a tape recording allegedly made by the victim and matters referred to on that recording where the State received the recording on 19 April 1989 and provided a copy to defendant the next day; on 24 April the court ordered that funds be provided to defendant for purposes of investigating the tape; on 1 May the court ordered the State to provide to defendant the date the tape was discovered and the names of the persons who discovered it; presentation of evidence commenced in defendant's trial on 8 May and the State offered the tape into evidence on 15 May; defendant produced eight witnesses who testified that the voice on the tape was not that of the victim; defendant also produced a witness from a pharmacy to testify concerning the victim's statement on the tape that he had gone to the pharmacy to have certain pills identified; and it thus appears that defendant had ample

time to discover and introduce evidence concerning the tape which was favorable to her case.

**Am Jur 2d, Evidence § 436.**

**14. Criminal Law § 162 (NCI3d) — failure to object to evidence — waiver of right to assign error**

Defendant's failure to object and her affirmative acquiescence in the admission of a videotape constituted a waiver of her right on appeal to assign as error the admission of the videotape and its use during the trial.

**Am Jur 2d, Evidence § 801.5.**

**Admissibility of videotape film in evidence in criminal trial. 60 ALR3d 333.**

**15. Homicide § 15 (NCI3d) — murder of husband — racial statement — telephone conversation with young male — absence of prejudice**

A defendant on trial for the murder of her husband was not prejudiced by testimony that she once said she might change her job because "she was afraid the black lady would get the job" as her supervisor where nothing related to race was at issue in the case and the statement was insignificant. Nor was defendant prejudiced by testimony that she telephoned a young male several weeks after her husband's death where her conversation with him tended to support her contention that the victim placed the gun with which he was killed under his pillow because he was afraid of someone breaking into the house.

**Am Jur 2d, Evidence § 650.**

**16. Homicide § 15.2 (NCI3d) — intent to see psychiatrist — absence of prejudice**

A defendant on trial for the murder of her husband was not prejudiced by testimony that defendant told a witness after her husband's death that she intended to start seeing a psychiatrist.

**Am Jur 2d, Evidence §§ 355, 363, 650.**

**17. Criminal Law § 169.3 (NCI3d) — admission of testimony — similar evidence by defendant — absence of prejudice**

Defendant was not prejudiced by a witness's testimony where defendant first injected the subject matter of such

testimony into the trial by introducing portions of a tape recording made by the victim before his death which contained matters about which the witness testified.

**Am Jur 2d, Evidence § 268.**

18. **Homicide § 15.2 (NCI3d) — murder of husband — calmness of defendant — giving away victim's clothing**

In a prosecution of defendant for the first degree murder of her husband, testimony that defendant was calm and not crying on the morning of the victim's death and that she gave away some of his clothing on the day after his funeral was admissible as opinion evidence on defendant's emotional state shortly after her husband was killed based on the witnesses' observations of her demeanor at that time.

**Am Jur 2d, Evidence § 366.**

19. **Homicide § 21.5 (NCI3d) — first degree murder — intent to kill — sufficiency of circumstantial evidence**

There was substantial circumstantial evidence to support a jury finding that defendant's shooting of her husband was not accidental but that she intentionally killed him after premeditation and deliberation where there was evidence tending to show that defendant had control of the weapon before she discharged it; the victim feared defendant due to her prior actions toward him; defendant gave inconsistent versions of the "accident" to the medical examiner and the police, and both of those versions were inconsistent with the physical evidence; defendant was the victim's sole insurance beneficiary and would receive a very substantial sum of money at his death; defendant needed money badly and had been borrowing money without the victim's knowledge and concealing that fact from him; and defendant's prior husband had died in a manner strikingly similar to the manner in which the victim died.

**Am Jur 2d, Evidence §§ 266, 1125.**

**Modern status of rule regarding necessity of instruction on circumstantial evidence in criminal trial — state cases. 36 ALR4th 1046.**

20. **Criminal Law § 1352 (NCI4th) — mitigating circumstances — unanimity requirement — McKoy error not cured or harmless**

The trial court's unanimity requirement for mitigating circumstances set out in the second and third issues on the

verdict form and in the related oral instructions during the penalty phase of a first degree murder trial constituted *McKoy* error, and this error was not cured by the court's instruction relating to the fourth issue that any individual juror could consider a mitigating circumstance which he or she found to exist by a preponderance of the evidence when the juror made a final recommendation as to defendant's sentence even if the circumstance had not been unanimously found by the jury. Furthermore, the State failed to show that the *McKoy* error was harmless beyond a reasonable doubt where the jury failed unanimously to find the submitted fifth or "catchall" mitigating circumstance, and a juror reasonably might have found the "catchall" mitigating circumstance to exist based on evidence tending to show that defendant worked with numerous young people and acted like a mother to children other than her own, and that defendant cooperated with law enforcement officials in their investigation of the case and willingly complied with their request that she reenact on videotape her account of what happened on the day she killed her husband.

**Am Jur 2d, Evidence §§ 598, 628.**

**Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed or carried out. 90 L. Ed. 2d 1001.**

Justice MEYER concurring in part and dissenting in part.

APPEAL of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death upon the defendant's conviction for first-degree murder, entered by *Allen (J.B.), Jr., J.*, in Superior Court, LEE County, on 19 May 1989. Heard in the Supreme Court on 6 May 1991.

*Lacy H. Thornburg, Attorney General, by William N. Farrell, Jr., Special Deputy Attorney General, for the State.*

*Tharrington, Smith & Hargrove, by Roger W. Smith, Melissa H. Hill, Douglas A. Ruley, Daniel W. Clark, and Marcus W. Trathen, for defendant-appellant.*

MITCHELL, Justice.

The defendant was tried on a true bill of indictment at the 1 May 1989 Criminal Session of Superior Court, Lee County, and

was convicted of one count of murder in the first degree. The jury recommended and the trial court entered a sentence of death. On appeal, the defendant brings forth numerous assignments of error. We conclude that the guilt-innocence determination phase of the defendant's trial was free from prejudicial error. However, errors during the sentencing proceeding require that the sentence of death be vacated and that this case be remanded to the Superior Court for a new sentencing proceeding complying with the recent decision of the Supreme Court of the United States in *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990).

The State's evidence in the present case tended to show that in the fall of 1978, the defendant and the victim, Allison Russell Stager III, met and began dating. On 17 March 1979, they were married.

On 1 February 1988, the defendant and Russell Stager resided in Durham. Jason and Brian Stager, the defendant's sons from her previous marriage, had been adopted by Russell approximately eight years earlier. Fourteen-year-old Jason lived with his parents.

At 6:08 a.m. on 1 February 1988, Jason Stager telephoned the 911 emergency operator from his home. Jason told the operator that his father had suffered a gunshot wound and that his mother had asked him to call for an ambulance. A volunteer unit from the Lebanon Fire Department (the "Lebanon First Responders"), an Emergency Medical Services unit, and three deputies from the Durham County Sheriff's Department were dispatched to the residence.

Douglas Griffin of the Lebanon First Responders was the first person to arrive. Jason Stager directed Griffin to a bedroom. The bedroom door was open approximately two inches. When the door opened, the light came on in the darkened bedroom and the defendant appeared at the door. Griffin recalled that she showed "a slight indication of crying but very little."

The defendant backed up and motioned toward the bed as Griffin entered. Russell Stager was lying with his left side on the right side of the bed. He was not lying "cleanly on his shoulder," but was turned slightly toward the pillow with his face in the pillow and his left eye somewhat covered by the pillow. There was a twelve to eighteen inch bloodstain on the pillow behind Russell's head, and blood was coming from his nose and mouth.

There also was blood on the hair on the back left side of his head. His body was normal in color, but his face was ashen and his eyes were rolled back in his head.

Griffin pivoted Russell so that his face would be out of the pillow and his breathing would be easier. As Griffin was taking the victim's blood pressure and pulse, Doug Wingate, another member of the Lebanon First Responders, entered the room and began to help. In the process of reading Russell's vital signs, they turned his head. This caused the pillow to shift around, thereby exposing a .25 caliber Beretta pistol. Beyond the pistol, and further underneath the pillow, lay a spent shell casing. Noticing that the hammer on the pistol was cocked, Griffin did not move the pistol. The defendant commented that she had already moved the pistol.

When Wingate asked the defendant what had happened, she said that the gun had discharged as she was pulling it out from under the pillow. She said that she had heard her son get up, and she had been trying to remove the gun in case her husband awoke and thought someone was in the house. The defendant told Wingate that they kept a gun because they had heard noises at night and were concerned about burglars.

The first law enforcement officer to arrive on the scene was Deputy Sheriff Clark Green. When he arrived shortly after 6:15 a.m., the defendant was sitting on the edge of the bed and had changed into blue jeans, a sweat shirt, and tennis shoes. Her appearance was neat. Deputy Green secured the area and, together with Deputy Sheriff Paul Ernest Hornbuckle, interviewed the defendant.

Before they began the questioning, the defendant repeatedly said, "I kept telling him about those damn guns." The officers asked the defendant for some general information such as the victim's full name and age, and she was able to answer their questions without difficulty. They asked her about the gun, and the defendant stated that her husband was "in a stage about guns" and occasionally slept with a pistol. At that time, the defendant's son Jason came up and she directed Jason to tell the officers "about him having these stages about guns, he carries guns in the cars, leaves them under the pillow, he is scared [sic] about somebody coming into the house." Both Jason and the defendant said that the victim occasionally slept with a gun under his pillow. Deputy Green asked the defendant if there were any marital problems, and she said no.

While the officers were questioning the defendant, one of the emergency medical technicians interrupted to ask if one of the officers would remove the gun from the bedroom. Deputy Hornbuckle removed the gun from beneath the pillow; the gun pointed toward the victim. The shell casing was also removed from under the edge of the pillow.

Michael Kevin Wilson, a member of the Lebanon First Responders and also an emergency medical technician with Durham County Hospital, arrived at the scene after Deputy Hornbuckle had removed the gun. When Wilson arrived, the defendant was standing in the bedroom to the left of the bed. The defendant became such a distraction to the medical personnel that they asked Deputy Hornbuckle to remove her from the room. The defendant repeatedly made statements such as "I'm scared of these things, my God I wish we didn't have them. . . . I wish he wouldn't have these things under there, I'm scared of guns, guns are not safe, you know, there are kids in the house." Wilson described the repetitious nature of these statements as like a "chant."

Wilson was a member of the same church as Barbara and Russell Stager and Russell's parents. After Russell was treated at the Stager residence and transported to Duke Medical Center, Wilson told the defendant that he would be happy to contact her husband's parents or their pastor and drive them to the hospital. The defendant responded that she did not want Russell's father called and told Wilson not to call anyone. Wilson testified that the defendant's response startled him. He later asked Douglas Griffin, the first person to arrive at the scene, to go home and immediately prepare a report concerning what he had observed at the scene that morning. Griffin's report indicated that the defendant had stated to the emergency medical personnel that her husband had been hearing sounds outside of the house during the night and had placed the pistol under his pillow. The next morning, upon hearing her son awake in the house, the defendant reached under the pillow to remove the pistol and it fired.

Phyllis Hunnicutt Cagle, secretary to the principal at Durham High School, testified that the defendant telephoned her at home around 7:00 a.m. on 1 February 1988. The defendant informed Cagle that the victim, a coach and teacher at the school, would not be at work that day. When Cagle asked the defendant if the victim was sick, the defendant hesitated and then said "yes."

Doris Stager, the mother of the victim, testified that she last saw her son alive on 31 January 1988, the day before his death. She recalled that after supper, while they were sitting around, the defendant asked Russell to move from a chair at the end of the couch to a chair sitting across from his mother. After he moved to the chair across from his mother, the defendant sat down on the floor beside the chair, reached up and held his hand. As the defendant reached up and grabbed Russell's hand, she looked directly at Doris. Russell did not respond to the defendant's display of affection.

On 1 February 1988, at approximately 8:45 a.m., Doris received a telephone call from the defendant's mother, Marva Terry. She told Doris that the victim was in the emergency room at Duke Hospital and that the defendant wanted Doris there. As Doris walked into the room at the hospital, the defendant began saying, "I'm sorry, I didn't mean to do it, forgive me." Russell Stager died around noon that day.

Doris Stager testified further that on 2 February 1988, she and her husband were at the funeral home assisting the defendant with the funeral arrangements when she heard the defendant speaking with the funeral director about drawing Social Security on the two boys. On 5 February, the defendant called Doris and informed her that she had been to the Veterans Administration. The defendant wanted to know if Russell had ever been in the regular Army. She said that she had been told that she could draw insurance only if Russell had been in the regular Army. Doris responded that he had been in the Army Reserves and the National Guard. On the following Tuesday, 9 February 1988, the defendant told Doris that she had given all of Russell's clothes to two churches. On 15 February 1988, the defendant and Doris had a conversation at Doris' home. The defendant again told Doris that the shooting was an accident and that she wanted forgiveness. The defendant also said that she was not going to be able to make her monthly house payment because it would take her entire salary to do so. The defendant also indicated that after she got insurance payments from the National Guard and the school where the victim had worked, she would be able to make the house payment.

Dr. Franklin Honkanen, a pathologist and Durham County Medical Examiner, was working at Duke University Medical Center on 1 February 1988. He testified that the defendant told him that

STATE v. STAGER

[329 N.C. 278 (1991)]

her husband kept a large number of guns in the house and that many of the guns had been loaded. She stated that they had been concerned over break-ins in the neighborhood. She said that the victim previously had slept with a pistol under the pillow. She had not liked this practice, however, and he had said he would not do it again. The defendant also told the doctor that on the morning of the shooting, she awakened around 6:00 a.m. and stretched out on her stomach. As her right hand reached underneath the victim's pillow, she felt something hard. As she pulled it out from under the pillow, she realized that it was a gun and started to get out of bed. The defendant stated that she was backing off of the bed when the gun fired, hitting the victim. Dr. Honkanen asked her if she knew approximately how far away from the victim she was when the victim was shot and whether she could describe how the gun discharged. The defendant replied that she did not know how the gun went off, but that it was in her hand and she thought she was somewhere at the edge of the bed, between three and five feet away from the victim.

The defendant told Dr. Honkanen that she was not yet standing when the gun discharged. She stated that she was not holding the gun up when it fired, but was dragging it across the bed. In response to Dr. Honkanen's question as to whether the victim usually slept with a gun, the defendant said that, although the victim usually did not sleep with a gun, he had slept with one on at least one prior occasion. The defendant stated that they had argued about this practice and that the victim had promised not to do it any more. The defendant stated that she was surprised that morning to find a gun under the pillow. As Dr. Honkanen was concluding his interview and expressing his condolences, the defendant stated that she thought the shooting was a terrible accident that she would have to live with.

Dr. Honkanen examined Russell at the hospital and found a single bullet wound approximately in the middle of the back of his head. The wound had been cleaned and sutured by that time, and a small circle of hair had been removed from around the wound. Dr. Honkanen did not see any powder deposits or any evidence of burning or singeing. He opined that there could have been powder marks around the wound if the weapon had been fired within a distance of eighteen inches, as well as burning or singeing if the weapon had been discharged within one foot.

R.D. Buchanan, Homicide Detective with the Durham County Sheriff's Department, testified that he learned of the victim's death at 12:45 p.m. on 1 February 1988. He met the defendant at her parents' home later that day. The defendant told Buchanan that she was in the bed that morning when the alarm clock went off in her son's room. She then reached over to her husband and felt an object underneath the pillow. As the defendant stuck her hand under the pillow and pulled the pistol out, she attempted to lift it and raise herself in the bed. At this point, the pistol discharged. The defendant stated that she had told her husband in the past not to place guns under the pillow, and that on this particular morning she did not know that the gun was there.

The defendant then went to her residence with Buchanan. They went into the bedroom, and the defendant demonstrated the positions that she and Russell were in when the gun discharged. Buchanan observed a shotgun in the corner of the bedroom while he and the defendant were there.

On 5 February 1988, Buchanan again spoke with the defendant. At that time, he asked the defendant if it would be possible to do a reenactment of the shooting. The defendant agreed to do the reenactment, which was preserved by means of video recording. After the reenactment was completed, the defendant told Buchanan that she kept asking herself why Russell would have kept a gun that was ready to fire under his pillow. In addition, the defendant stated that she did not know anything about guns and that she did not like guns. The defendant also inquired as to how the insurance company would know that the shooting was accidental.

On 15 February, the defendant called Buchanan and wanted to know about the pending listing on the death certificate. She wanted to know again if the case was closed out as accidental. The defendant informed Buchanan that the death certificate showed that the autopsy was complete.

Buchanan spoke with the defendant again on 5 April seeking information regarding the pistol used in the shooting. The defendant told Buchanan at that time that the gun had been purchased from a business in Durham. On 15 April, Buchanan and Agent Steve Myers of the State Bureau of Investigation interviewed the defendant at her residence. The defendant stated to the officers that she and Russell had purchased the pistol at least two years earlier. Initially, it had been purchased for the defendant's protec-

STATE v. STAGER

[329 N.C. 278 (1991)]

tion. However, she did not know how to use the pistol, and Russell had later moved it to an unknown location. The defendant said that her husband had done a lot of shooting and had been on the National Guard Pistol Team. She stated that she had accompanied her husband to an underground shooting range on one occasion and that she shot approximately two clips in the pistol he had that day. She also stated that she had never shot the .25 caliber pistol that killed her husband.

Buchanan also testified that the defendant said that she had a tremendous fear of guns. The defendant said she was unable to form an opinion as to whether the victim was careless with guns or not because she knew so little about them. She did say that Russell had told her not to point a gun at anyone unless she was going to use it, which she found funny since she did not know how to use a gun. In addition, the defendant told the officers that her husband had stated that he would confront and shoot anyone who broke into their house. The defendant found this statement odd because her husband was such a heavy sleeper who probably would not awaken if someone broke into the house. She also indicated that her husband occasionally slept with different weapons under his pillow.

The defendant told Buchanan that she had never purchased a .25 caliber pistol before. However, she also told Buchanan that her first husband had died from a pistol wound after she had purchased the pistol that killed him. Specifically, the defendant told Buchanan that Larry Ford, her first husband, had asked her to obtain a gun. She contacted her preacher and had him go with her to sign the gun permit. Another individual accompanied her to a gun shop to purchase the pistol. They then went out so that the defendant could practice shooting the gun. The defendant said that she had shot the pistol three to four times. Buchanan testified that the defendant said she believed that it was a "small .22 caliber pistol."

The defendant said that on the day that she purchased the gun, Larry Ford returned from a karate class in which he had been kicked in the groin. Because he was in some pain, the defendant decided to sleep on the couch. After falling asleep, she was awakened by a noise. When she went upstairs to check the source of the noise, she heard Larry gasping for breath. He had been shot by the gun that she had purchased earlier that day and was

lying on the bed. She stated that a medical examiner later told her that he could find no residue on Larry's hands and that he believed that Larry had dropped the gun causing it to fire accidentally.

Buchanan also testified that the defendant said that she was going to receive over $100,000 in life insurance proceeds as a result of Russell's death. In addition, she said that there was credit life insurance on Russell's life that would pay the balance owed on a vehicle once the defendant received the supplemental death certificate, as well as credit life insurance that would pay the balances owed on two other accounts.

The defendant also told Buchanan that she was not prepared for Russell's death. The two had prepared wills the year before, with Russell leaving property and checking accounts to the defendant. The defendant said that the only problems she and Russell had confronted were financial and that they had been through two very rough financial situations.

Master Sergeant Graham Lee of the North Carolina National Guard testified that Russell Stager was a sergeant in the National Guard and a member of his company's pistol team. In Sergeant Lee's opinion, Russell was an orderly, safe and cautious individual.

Dr. Thomas Clark, a forensic pathologist with the Office of the Chief Medical Examiner of North Carolina, conducted an autopsy on Russell on 3 February 1988. The victim had a gunshot wound to the back of his head. Dr. Clark determined from his examination and the recovery of metal fragments that the bullet involved was a small caliber copper-jacketed bullet consistent with firing from a .25 caliber pistol bullet. The point of entry was about the level of the ears just to the right of the midline of the back of the head. The bullet traveled forward, to the left and across the brain and hit the left side of the front part of the skull. The bullet then bounced back and was recovered from the front part of the brain.

Dr. Clark testified that there was no powder stippling in or around the wound. Based upon this lack of powder stippling or powder particles in or about the wound, Dr. Clark concluded that the gunshot that killed the victim had been fired from a distance of more than two feet from the victim. He concluded that if the victim was lying on his left side when he was shot, "the bullet would necessarily have come from above the midline part of the head."

Chris Wagoner, a former high school baseball player who had been coached by Russell Stager, testified that he received a telephone call from the defendant, Barbara Stager, on the day after Russell's funeral. She asked that he and some other players bring the victim's belongings from his office at school to the house. In addition, the defendant asked for assistance with some of the victim's personal belongings at their home. Wagoner took the items from Russell's office to the Stager home. He then removed the victim's clothes and belongings from the attic and placed them on a truck. These items were given to charity.

A.C. Webster, a sergeant in the Durham County Sheriff's Department, testified that he was in charge of firearms training, weapons, weapons maintenance and anything to do with specialized weapons in the Sheriff's Department. In connection with his duties and responsibilities, he attended several armory schools. At these schools, he learned how to work on weapons, as well as maintain and repair them. At Detective Buchanan's request, Sergeant Webster examined the .25 caliber Beretta pistol that killed Russell Stager. Sergeant Webster testified that the Beretta is a magazine fed .25 caliber semi-automatic pistol. If a semi-automatic pistol is fired, it will fire the round that is in the chamber, eject the spent casing and move another round from the magazine into the firing chamber. Such a pistol automatically cocks itself for the second round. The Beretta is equipped with a safety located near the rear of the weapon. When engaged, the safety will prevent the weapon from firing.

Sergeant Webster fired the Beretta a total of eight times. Each time he fired the weapon, he found that the spent shell casings ejected from the pistol traveled to the right and rear of the shooter. The safety on the grip had to be manually engaged. Both the safety and the weapon were functioning properly on the day that he tested the gun.

Eugene Bishop, a firearms examiner with the State Bureau of Investigation, testified that he also tested the Beretta. Bishop concluded that the bullet and bullet fragments taken from the victim's brain were fired from the Beretta pistol. In addition, he testified that the Beretta could be loaded in two ways: (1) by placing a live round in the chamber, closing the chamber, manually cocking the external hammer and pulling the trigger, or (2) by placing a loaded magazine in the weapon and pulling the slide back. Bishop

testified that in addition to the thumb safety on the grip, the Beretta had another type of safety which could be engaged by pulling back on the hammer a "quarter cock." He testified that it was difficult to push the thumb safety up into a full safety position, and that it took a definite movement to push that safety down or off so as to allow the pistol to fire.

Bishop also testified as to the ejection pattern of the Beretta. He found that most of the spent shell casings were ejected to the right rear of the shooter, but that on at least one occasion, the spent casing came straight back or back to the left. The spent casings would travel two to six feet when ejected from the gun. A trigger pull of four and one-half pounds of pressure was required before the weapon would fire. He also concluded that the Beretta was in proper working condition.

Special Agent Michael Creasy, a forensic chemist in the crime laboratory of the State Bureau of Investigation, testified that he had examined certain exhibits for gunshot residue in connection with the case. Specifically, he examined the mattress cover, the blanket, the sheets, and the pillowcases from the bed in which Russell Stager was killed. He examined those items in order to determine whether they bore any tears or burning that could be associated with the discharge of a gun. He testified that he would have expected to find singe marks or actual damage to the fabric if the gun had discharged within six inches of any of the items examined. His examination failed to reveal any such marks or burning that he could identify as being associated with the discharge of a firearm.

Sandra Biddle, the wife of a Durham High School coach, testified that she had known both Russell Stager and the defendant. She recalled a conversation she had with the defendant in October of 1987. The defendant told Biddle that the victim was teaching her how to shoot a small handgun for protection.

Gilly Boaz, a member of the National Guard between 1983 and 1988, testified that he and the victim shared an interest in handguns and were on the rifle team together. Boaz spent a lot of time with the victim when firearms were in use and observed that the victim safely handled firearms. Boaz could not recall an instance when the victim did not have the slide back on a semi-automatic pistol when it was not in use. Both Boaz and the victim

attended a pistol coaching course the year prior to the victim's death. Safety was the number one priority in this course.

Boaz also accompanied the victim and the defendant to an indoor pistol range at an armory in the fall of 1984. Boaz observed the defendant using one of the victim's pistols at that time. The pistol the defendant used on that occasion, a .22 caliber semi-automatic Ruger Mark 3, is in many respects similar to the .25 caliber Beretta used in the shooting of the victim. The only real difference between the two is that the Ruger Mark 3 is a target pistol, which the Beretta is not. Boaz saw the defendant fire the Ruger Mark 3 and hit the paper target, which he characterized as "no small feat." The defendant did not appear to be scared or uncomfortable firing the pistol.

Patty Boaz, Gilly's wife, testified that she too was at the firing range with her husband and the Stagers. At that time, the defendant told her that she did not like guns, although "the more she was with them the more she [be]came familiar or comfortable with them."

The State also presented evidence that the defendant was the sole beneficiary of more than $164,000 in life insurance proceeds resulting from her husband's death. Further, the defendant had been engaged in a pattern of borrowing money prior to the victim's death without the knowledge of the victim, including forging his name on loan applications as well as on a motor vehicle title in order to secure one of the loans. In order to keep this activity secret, the defendant had the bills mailed to her parents' home. This pattern of borrowing began in January of 1987 and concluded with a $10,000 loan obtained nine months later. After the defendant missed payments on a $10,000 bank loan, she began forging checks on her husband's accounts. When she missed the second payment, the bank informed the defendant that the victim would have to be contacted if she did not make the payment. The defendant asked the bank not to call her husband because they were having problems and another female was involved.

Alma Mae Smith testified that she notarized the victim's purported will around March of 1987. This purported will was notarized in the absence of the victim, after the defendant brought it to Smith at work and asked her to notarize the victim's signature. The defendant stated that she was asking Smith to notarize the will because Smith was familiar with the victim's handwriting. No

witnesses had signed the will, nor were there any witnesses to the will in the room at the time Smith notarized the will. However, when the will later was admitted to probate, the names of Mary Terry, Alton Terry, and Marva Terry appeared on the will.

Smith also testified that she went to the defendant's home on the night of the victim's death. She observed that the defendant "was very calm to have gone through what had happened during the day."

The State's evidence also tended to show that in December of 1988, Frederick Evans, a Durham High School student, found a cassette tape in a school locker room. Evans found the tape about twenty feet from the victim's office under one of the stalls in the locker room. Evans picked up the tape, took it home and gave it to his mother.

Evans' mother placed the cassette tape on her dresser, where it stayed until April 1989. In April 1989, Evans listened to the recording on tape for the first time. He recognized the victim's voice on the tape expressing serious concerns about the defendant's behavior. Evans and his mother listened to the tape and decided to turn it over to the police. The police received the tape from Evans and his mother on 18 April 1989.

The State also introduced evidence concerning the death of the defendant's first husband, Larry Ford. The State's evidence tended to show that shortly after midnight on 22 March 1978, emergency medical services personnel were called to the home of Larry Ford. Ford was dead when an ambulance arrived.

Robert Perry, an emergency medical technician, testified that he had occasion to go to a house in Trinity, North Carolina on 22 March 1978. He was accompanied by his partner, Jim Owens. When Perry and Owens arrived at the location, they were met in the kitchen by Barbara Ford (now the defendant Barbara Stager). She stated that her husband was upstairs and had been shot. She believed he was dead. Perry found Larry Ford lying on the bed with his eyes closed. He was dead. There were bloodstains on the front of his pajama top.

Perry turned back the bedding covering Ford and found the clip from a gun in the bed with Ford. The gun was lying on the right side of the bed near Ford's hip or waist area. Ford's right foot was hanging off the bed on the floor. There was a gunshot

entrance wound just to the right of the sternum along the line of Ford's nipple. Perry concluded that Ford had been dead for at least five minutes. Perry drew his conclusion from the skin temperature and color of the body and the fact that blood on the body had already dried.

After concluding that Ford was dead, Perry went downstairs and informed the defendant. He observed that the defendant was very calm and did not display any emotion that would correspond to the situation. The defendant volunteered something to the effect that Ford had bought her a gun for her protection, but she did not say anything else. Perry's observations at the scene led him to call the EMS Director because of the questionable circumstances of Ford's death.

Perry saw the box that the gun came in on top of a chest in Ford's bedroom. It had a small push rod with it, but there was no oil or rags. Perry and Owens diagrammed the room, including where Ford was lying and the location of the gunshot entrance wound. In addition, they bagged Ford's hands for the purpose of performing a gunshot residue test.

During the time Perry was on the premises that night, the defendant never came upstairs to the bedroom. At some point, the defendant told Perry that the reason she was downstairs and her husband was upstairs was because he had been struck in the groin at karate practice. She stated that he thought she might roll over and hurt him if she slept with him so she decided to sleep downstairs.

Jim Owens testified that when he and Perry arrived at the scene on 22 March 1978, he met the defendant. She stated that her husband, Larry Ford, had been shot and she thought he was dead. Owens testified that what always stuck in his mind about that night was that she "wasn't exactly very upset about the whole situation."

Owens' best recollection of the defendant's first statement was that: "[H]e had shot himself or accidentally shot himself, the gun went off." While Owens could not recall her exact words, he indicated that the defendant essentially said that Ford shot himself cleaning the gun and that she was pretty sure he was dead. These statements were made before the emergency medical technicians ever went upstairs.

In addition, Owens recalled that the defendant stated that the gun had been purchased at Ford's insistence a few days earlier for her protection. Owens observed the receipt for the gun, the gun case, and a little brush sitting on top of a dresser near the bed. He specifically recalled that the clip to the gun was somewhere beneath the covers. The last thing that Owens recalled was the defendant offering coffee or something to drink.

Larry Allen, a former deputy in the Randolph County Sheriff's Department, testified that he arrived at the Ford residence around midnight on 22 March 1978. The defendant told Allen that her husband had come from karate class where he had been kicked in the groin. She chose to sleep downstairs because he was uncomfortable. She said she heard a noise and went upstairs to the bedroom and saw Ford lying in bed gasping for breath. Apparently he had been shot.

Allen observed that the bed covers were turned back, but that they were not "messed up." A clip for a .25 caliber automatic pistol was lying in the bed. Also found in the bedroom was a receipt for the purchase of the .25 caliber automatic pistol found in the bed. The receipt was dated 21 March 1978 at 3:35 p.m.

Joseph E. Hoover, former Director of the Randolph County Ambulance Service, testified that he went to the Ford residence on 22 March 1978. Hoover, along with Allen, discovered that the .25 caliber automatic pistol found at the scene ejected shells to the right and back. Before Hoover left, the defendant told him that she had just made coffee and would be glad for him to have coffee with her.

Dr. Brad Randolph, a forensic pathologist, conducted an autopsy on the body of Larry Ford. He concluded that the cause of death was a gunshot wound to the chest which passed through the main artery from the heart to the lungs. In his opinion, Ford would have been conscious for one to two minutes and would have bled to death in ten to fifteen minutes.

John Bueheller, former Detective Lieutenant in charge of the Investigative Division of the Randolph County Sheriff's Department, testified that he took handwipings from Larry Ford for the purpose of performing a gunshot residue test to determine if Ford had fired a weapon. Michael Creasy, a forensic chemist with the State Bureau of Investigation, testified that he examined the hand-

STATE v. STAGER

[329 N.C. 278 (1991)]

wipings taken from Ford and conducted a gunshot residue test. No gunshot residue was present on Ford's hands, leading Creasy to conclude that Ford had not fired a weapon. However, when Creasy test fired the pistol found in Ford's bed, it left significantly high concentrations of gunshot residue.

Special Agent Eugene E. Bishop, a firearms examiner with the State Bureau of Investigation, testified that he tested the .25 caliber automatic pistol found with Larry Ford's body. When it was dropped from a distance of at least five feet on a tile floor, it would fire. When dropped from a distance of less than five feet, the pistol would not fire. Bishop did not believe that the gun would fire if dropped from five feet on a carpeted floor.

Doris Ford, Larry Ford's mother, testified that she arrived at the Ford residence around 3:00 a.m. on 22 March 1978. She lived only twenty minutes from the Ford residence, but arrived at the same time as the defendant's parents, who lived in Durham. On the day of Larry Ford's funeral, the defendant gave his clothes away.

Doris Stager testified that the defendant had told her that on the night of Ford's death, she was downstairs hanging up clothes. Ford was upstairs cleaning his gun when it accidentally fired.

Barbara Landrum, a former co-worker of the defendant, testified that approximately one week prior to Larry Ford's death the defendant told her that she had come home and found Ford in the bed with another woman. The defendant also said that she had been sleeping downstairs.

Frank Green, one of the defendant's co-workers during March 1978, testified that the defendant had asked him on 21 March 1978 if he would assist her in purchasing a handgun from a local gun shop. The defendant asked Green to advise her on what type of gun to purchase to carry in her pocketbook. She told Green that she wanted an automatic. Green recommended that she purchase a .25 caliber automatic. After the defendant purchased a .25 caliber automatic pistol, Green accompanied her to the edge of the county. Green spent fifteen to thirty minutes showing the defendant how to fire, load, and unload the gun. Green also demonstrated the normal safety steps. Green told the defendant to be careful even when the clip was out because the gun could fire with the clip

out if there was a bullet in the chamber. The defendant fired the pistol on that occasion.

Representatives from two insurance companies testified that the defendant received in excess of $46,000 in insurance proceeds as a result of Larry Ford's death. In addition, Ford's holographic will, filed for probate on 29 March 1978, devised the house and furnishings to the defendant. The house was valued at $40,000.

Additional evidence and other matters relevant to the defendant's specific assignments of error are addressed at other points in this opinion.

By an assignment of error, the defendant contends that the trial court committed reversible error by admitting evidence concerning the death of her first husband, Larry Ford. The defendant argues, *inter alia*, that the evidence concerning her first husband's death was not relevant to prove intent, lack of accident or a common plan or scheme. She further argues that any probative value of such evidence did not outweigh its prejudicial effect and that its admission violated her constitutional right to a fair trial. We find no error.

On 27 June 1988, the defendant filed a motion *in limine* to prohibit the State from presenting any evidence about the death of Larry Ford. After a hearing on 16 December 1988, the trial court denied the motion. The trial court deferred ruling on a later similar motion until the evidence was offered.

During the trial testimony of the State's witness Detective R.D. Buchanan, the State announced its intention to question Detective Buchanan about two conversations he had with the defendant concerning Ford's death. The trial court then conducted a *voir dire* hearing to determine whether the testimony was admissible. The defendant asked the trial court to exclude the testimony on the ground that any evidence regarding Ford's death was irrelevant and unduly prejudicial. The State argued that the testimony was admissible under N.C.G.S. § 8C-1, Rule 404(b) to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. The trial court overruled the defendant's objection and admitted the evidence.

Detective Buchanan first described a conversation he had with the defendant on 5 February 1988—when he was at her home

to videotape her reenactment of the death of Russell Stager—as follows:

> Prior to the filming she stated to me she had not mentioned to me about her first husband being killed because she did not think it was important. . . . I told her that I was not looking into that incident but was trying to put together what happened in this particular incident.

Buchanan also testified that during a later interview of the defendant at her home on 15 April 1988, she told him that:

> In 1978 she was working for a real estate company in High Point. She had people follow her home several times. Larry, her husband at the time, had her to go see a man he knew about a gun. She stated that she always did everything Larry said to do. She contacted her preacher like Larry said and had him go with her to sign the gun permit. Frank, an employee at the real estate company where she worked, went with her to the gun shop to buy the gun. She and Frank then went somewhere behind an old farm house or an old house and shot the gun. She stated they were there around ten minutes at the most and she shot the gun three or four times. She thinks the gun was a small .22 caliber pistol.

> She stated that on the night of the day that she bought the gun, Larry came home from karate class and had been kicked in the crotch. Larry was a black belt in karate. Larry was in some pain so she decided to let Larry sleep in the bedroom and she would sleep on the couch. She stated that she went to sleep on the couch and she was awakened by a noise. She thought it was a figurine which had fallen off the wall and she went to check.

> She stated that she went up the stairs and heard Larry gasping for breath. Larry had been shot by the gun she had bought. She stated that he was lying on the bed. She later spoke with the medical examiner who stated that he could find no residue on Larry's hands and said that he felt that Larry had dropped the gun and it had accidentally went off.

Later in the State's case, the State announced its intention to offer more evidence regarding Ford's death. Once again, the defendant objected to the admission of the evidence. The trial court conducted a *voir dire* hearing and ruled that the evidence

was admissible under N.C.G.S. § 8C-1, Rule 404(b) to show intent, plan or preparation, or absence of accident. The State then introduced other evidence concerning Ford's death.

N.C.G.S. § 8C-1, Rule 404(b) provides:

> (b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

Rule 404(b) clearly provides that " 'evidence of other offenses is *admissible* so long as it is *relevant to any fact or issue other than* the character of the accused.' " *State v. Coffey*, 326 N.C. 268, 278, 389 S.E.2d 48, 54 (1990) (quoting *State v. Weaver*, 318 N.C. 400, 403, 348 S.E.2d 791, 793 (1986) ).

This Court has defined "relevant evidence" as " 'evidence having any tendency to make the existence of *any fact* that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' " *Id.* (quoting N.C.G.S. § 8C-1, Rule 401 (1988) ). We have interpreted this definition broadly:

> "Evidence is relevant if it has *any* logical tendency to prove a fact at issue in a case, . . . and in a criminal case every circumstance calculated to throw *any* light upon the supposed crime is admissible and permissible. It is not required that evidence bear directly on the question in issue, and evidence is competent and relevant if it is one of the circumstances surrounding the parties, and necessary to be known, to properly understand their conduct or motives, or if it reasonably allows the jury to draw an inference as to a disputed fact."

*State v. Riddick*, 316 N.C. 127, 137, 340 S.E.2d 422, 428 (1986) (emphasis added) (quoting *State v. Arnold*, 284 N.C. 41, 47, 199 S.E.2d 423, 426 (1973) ).

In *Coffey*, this Court stated that Rule 404(b) is "a clear general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant

STATE v. STAGER

[329 N.C. 278 (1991)]

has the propensity or disposition to commit an offense of the nature of the crime charged." 326 N.C. at 278-79, 389 S.E.2d at 54.

> Thus, even though evidence may tend to show other crimes, wrongs, or acts by the defendant and his propensity to commit them, it is admissible under Rule 404(b) so long as it also "is relevant for some purpose *other than* to show that defendant has the propensity for the type of conduct for which he is being tried."

*Id.* at 279, 389 S.E.2d at 54 (quoting *State v. Bagley*, 321 N.C. 201, 206, 362 S.E.2d 244, 247 (1987), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988)).

The trial court properly conducted a *voir dire* hearing to determine whether the evidence regarding the death of the defendant's first husband was offered pursuant to Rule 404(b), was of a type made admissible under that rule, and was relevant for some purpose other than showing the defendant's propensity for the type of conduct at issue. *See State v. Cummings*, 326 N.C. 298, 389 S.E.2d 66 (1990); *State v. Morgan*, 315 N.C. 626, 340 S.E.2d 84 (1986). The trial court specifically made the required findings and conclusions in this case and ruled that the proffered evidence of the circumstances surrounding the death of Larry Ford, the defendant's first husband, was admissible under Rule 404(b) as evidence of intent, plan, preparation, or absence of accident.

[1] On appeal, we must determine, *inter alia*, whether there was substantial evidence tending to support a reasonable finding by the jury that the defendant committed the "similar act." *See Huddleston v. United States*, 485 U.S. 681, 99 L. Ed. 2d 771 (1988) (construing Fed. R. Evid. 404(b)). In *Huddleston*, the Supreme Court of the United States held that evidence may be admitted under Rule 404(b) of the Federal Rules of Evidence if there is sufficient evidence to support a jury finding that the defendant committed the similar act; no preliminary finding by the trial court that the defendant actually committed such an act is required. *Huddleston*, 485 U.S. at 687-88, 99 L. Ed. 2d at 781. We find the reasoning of *Huddleston* compelling and conclude that evidence is admissible under Rule 404(b) of the North Carolina Rules of Evidence if it is substantial evidence tending to support a reasonable finding *by the jury* that the defendant committed a similar act or crime and its probative value is not limited *solely* to tending to establish the defendant's propensity to commit a crime such as the crime

charged. *See State v. Agee*, 326 N.C. 542, 391 S.E.2d 171 (1990); *State v. Coffey*, 326 N.C. 268, 389 S.E.2d 48 (1990).

[2] Under Rule 404(b) a prior act or crime is "similar" if there are " 'some unusual facts present in both crimes or particularly similar acts which would indicate that the same person committed both.' " *State v. Green*, 321 N.C. 594, 603, 365 S.E.2d 587, 593 (quoting *Riddick*, 316 N.C. at 133, 340 S.E.2d at 426), *cert. denied*, 488 U.S. 900, 102 L. Ed. 2d 235 (1988). However, it is not necessary that the similarities between the two situations "rise to the level of the unique and bizarre." *Id.* at 604, 365 S.E.2d at 593. Rather, the similarities simply must tend to support a *reasonable* inference that the same person committed both the earlier and later acts.

[3] In the case *sub judice*, substantial evidence was introduced tending to show the defendant made statements to various medical personnel and law enforcement officers concerning the circumstances surrounding the shooting of Russell Stager. The defendant affirmatively represented to those individuals that she had control of the weapon at the time of the shooting, but that the shooting was accidental. In addition, her statements and actions asserted or implied *inter alia* (1) that she did *not intentionally* shoot Russell Stager, (2) that she had *no knowledge* of guns or their operation and was afraid of guns, (3) that she had *no motive* to shoot her husband, (4) that she had *no plan* to shoot Russell, and (5) that she made *no preparation* to shoot her husband. Evidence concerning the death of the defendant's first husband, Larry Ford, and the surrounding circumstances was relevant evidence tending to disprove her assertions and to support findings contrary to those assertions. Therefore, that evidence was admissible under Rule 404(b) as evidence tending to show motive, intent, preparation, plan, knowledge or absence of accident. N.C.G.S. § 8C-1, Rule 404(b) (1986).

The defendant advances several arguments, however, in support of her assignment of error concerning the admission of evidence of Ford's death. First, the defendant argues that the Ford evidence is not relevant to prove intent or absence of accident. Evidence of similar acts may be offered to show that the act in dispute was not inadvertent, accidental or involuntary. McCormick on Evidence § 190 (3d ed. 1984). Where, as here, an accident is alleged, evidence of similar acts is more probative than in cases in which an accident is not alleged. The need for such proof is clear. "[I]n many situations, proof of absence of mistake or accident

has 'logical relevancy.' This is particularly true of evidence showing motive, intent, preparation, and design or plan." 1 Brandis on North Carolina Evidence § 92 (3d ed. 1988). Rule 404(b) evidence "may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from the conduct." *Huddleston*, 485 U.S. at 686, 99 L. Ed. 2d at 780.

The doctrine of chances demonstrates that the more often a defendant performs a certain act, the less likely it is that the defendant acted innocently. E. Imwinkelried, *Uncharged Misconduct Evidence* § 5:05 (1984).

> The recurrence or repetition of the act increases the likelihood of a mens rea or mind at fault. In isolation, it might be plausible that the defendant acted accidentally or innocently; a single act could easily be explained on that basis. However, in the context of other misdeeds, the defendant's act takes on an entirely different light. The fortuitous coincidence becomes too abnormal, bizarre, implausible, unusual, or objectively improbable to be believed. The coincidence becomes telling evidence of mens rea.

*Id.* (footnotes omitted). *See* II Wigmore, *Evidence* § 302 (Chadbourn rev. 1979) (illustrating specific examples of the doctrine of chances).

After a *voir dire* hearing in the instant case, the trial court found that the challenged evidence tended to show "striking similarities" between the deaths of the defendant's husbands Larry Ford and Russell Stager. Specifically, the trial court found and concluded that "the evidence concerning the death of James Larry Ford and the striking similarities to the evidence concerning the death of Mr. Stager both being allegedly accidental killings would be evidence for the jury to say and determine to show [sic] whether or not there is proof of intent, of any plan or any preparation but more important the absence of any accidental killing." The trial court based its findings and conclusions in this regard upon specific findings that evidence concerning the death of Ford, when taken with the evidence concerning Russell Stager's death, tended to show, *inter alia*, that (1) each of the defendant's husbands had died as a result of a single gunshot wound, (2) the weapon in each case was a .25 caliber semi-automatic handgun, (3) both weapons were purchased for the defendant's protection, (4) both men were

shot in the early morning hours, (5) the defendant discovered both victims after their respective shootings, (6) the defendant was the last person in the immediate company of both victims, (7) both victims died in the bed that they shared with the defendant, and (8) the defendant benefited from life insurance proceeds resulting from both deaths. The trial court further found and concluded that the evidence concerning Ford's death was relevant and probative and that its probative value outweighed any danger of unfair prejudice. Accordingly, the trial court concluded that the evidence concerning Ford's death "should be allowed for the purpose of showing any proof of intent, any plan, any preparation or the absence of any accident involved in the shooting of Mr. Stager and . . . that it can be admitted."

In *State v. Smoak*, 213 N.C. 79, 195 S.E. 72 (1938), this Court held that evidence of previous poisonings was admissible to show scienter, intent and motive. In *Smoak*, the State introduced evidence to show similarities in the circumstances surrounding the deaths of the defendant's first two wives and those surrounding the death of his daughter, for which he was on trial. In each case, the defendant had procured insurance on the life of the victim, the victim died of poisoning, and the defendant attempted to collect the insurance immediately upon the victim's death. We held that the evidence as to the wives' deaths was admissible to show motive as well as knowledge of the effect of poison in the killing for which the defendant was on trial. *Id.* at 91, 195 S.E. at 80. *Accord People v. Gosden*, 6 Cal. 2d 14, 56 P.2d 211 (1936).

Similarly, in *State v. Barfield*, 298 N.C. 306, 259 S.E.2d 510 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980), the admission of evidence concerning similar poisonings was held to be relevant and admissible to show knowledge, intent, motive, and the existence of a plan or scheme. "It is clear that evidence that a defendant committed other offenses is relevant to establish a defendant's knowledge of a given set of circumstances when such a set of circumstances is logically related not only to the crime the defendant is on trial for but also is logically related to the extraneous offense." *Id.* at 326, 259 S.E.2d at 528. The evidence of previous poisonings in *Barfield* was also relevant to show that the defendant had a specific intent in that the particular act was done intentionally rather than accidentally. *Id.* at 328, 259 S.E.2d at 529. In addition, the State may also introduce such evidence if it is relevant to establish a pattern of behavior on the part

of the defendant tending to show that the defendant acted pursuant to a particular motive. *Id.* at 328-29, 259 S.E.2d at 529. Finally, "[e]vidence of other offenses is admissible if it tends to show the existence of a plan or design to commit the offense charged, or to accomplish a goal of which the offense charged is a part or toward which it is a step." *Id.* at 329, 259 S.E.2d at 529. Essentially, there must be a "concurrence of common features." *Id.* at 329, 259 S.E.2d at 530.

In the case *sub judice*, evidence of the death of the defendant's first husband was admissible under Rule 404(b) for reasons similar to those stated and explained in *Smoak* and *Barfield*. The evidence concerning circumstances surrounding the death of Larry Ford was properly admitted as tending to show the defendant's knowledge and experience with the operation of and the potentially lethal effect of .25 caliber semi-automatic pistols. Further, the similarities in the shooting deaths of Larry Ford and Russell Stager were sufficient to tend to show intent. In addition, evidence that the defendant knew she would collect large sums of money following the deaths of both her husbands tends to establish a motive on her part. Finally, the jury could reasonably find a "concurrence of common features" from the evidence as to the similar manner in which each of the defendant's husbands died.

[4] The defendant contends, nevertheless, that the remoteness in time between the two incidents weighs heavily in favor of exclusion of evidence concerning Ford's death. Larry Ford died on 22 March 1978; Russell Stager died on 1 February 1988. Remoteness in time between an uncharged crime and a charged crime is more significant when the evidence of the prior crime is introduced to show that both crimes arose out of a common scheme or plan. *Riddick*, 316 N.C. at 134, 340 S.E.2d at 427. In contrast, remoteness in time is less significant when the prior conduct is used to show intent, motive, knowledge, or lack of accident; remoteness in time generally affects only the weight to be given such evidence, not its admissibility. *See Smoak*, 213 N.C. at 93, 195 S.E. at 81. Here, the death of the defendant's first husband ten years before the death of her second was not so remote as to have lost its probative value.

[5] The defendant also argues in support of this assignment of error that the evidence the State presented regarding Larry Ford's death included unnecessary details. The defendant complains in

this regard that the State introduced testimony from twenty witnesses, including the telephone operator who received the emergency call, rescue squad personnel, employees of different insurance companies and Ford's mother.

Generally, "[a]ll relevant evidence is admissible." N.C.G.S. § 8C-1, Rule 402 (1988). The extent to which counsel may pursue a permissible line of inquiry in questioning witnesses is a matter left to the sound discretion of the trial court. *Cf. Coffey*, 326 N.C. at 281, 389 S.E.2d at 56 (applying Rule 403). Here, we detect no abuse of that discretion by the trial court.

[6] In addition, the defendant complains of the admission of several photographs of Larry Ford's body. The photographs were used to illustrate certain witnesses' testimony as to where Ford was found, the position of his body, and the location of the bullet wound. This Court has held that such photographs may be introduced "so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury." *State v. Hennis*, 323 N.C. 279, 284, 372 S.E.2d 523, 526 (1988). Here, the photographs were not used excessively or repetitiously. The trial court found that there were differences in each of the proffered photographs and that each would assist the witnesses for the purposes of illustrating and explaining testimony. In addition, the trial court instructed the jury that the photographs were only to be used to illustrate witnesses' testimony. The use of photographic evidence is within the trial court's sound discretion. *State v. Robinson*, 327 N.C. 346, 356, 395 S.E.2d 402, 408 (1990). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *Id.* at 357, 395 S.E.2d at 408. We conclude that the trial court did not abuse its discretion by allowing these photographs into evidence for the limited purpose of illustrating witnesses' testimony.

[7] Further, the defendant contends that the probative value of the evidence regarding Ford's death was outweighed by the danger of unfair prejudice and that the trial court was required to exclude it for that reason under Rule 403 of the North Carolina Rules of Evidence. N.C.G.S. § 8C-1, Rule 403 (1988). Whether to exclude evidence under Rule 403 is a matter left to the sound discretion of the trial court. *Coffey*, 326 N.C. at 281, 389 S.E.2d at 56. After conducting a *voir dire* hearing on the Ford evidence, the trial

court made extensive findings—previously discussed herein—and concluded that the probative value of the evidence outweighed any unfair prejudice to the defendant and that the evidence was admissible to show intent, plan, preparation or absence of accident. The defendant has not demonstrated any abuse of discretion and, therefore, the trial court's ruling will not be disturbed on appeal. *Robinson*, 327 N.C. at 357, 395 S.E.2d at 408.

[8] The defendant also argues that the defendant's statements to Detective Buchanan concerning the death of her first husband ten years earlier, even if admissible, were admitted for an improper purpose. After a *voir dire* hearing to determine whether the evidence was admissible, counsel for the defendant argued that, if this evidence was admitted, the trial court should state the purposes for which it was being admitted and instruct the jury that the evidence should be considered only for a limited purpose. After making findings of fact, the trial court ruled, outside of the presence of the jury, that:

> The Court does find from hearing motions in this matter that the defendant is contending that the death of Russell Stager resulted as a result of an accidental shooting and after hearing arguments from the counsel for the State and the defendant the Court is going to rule that this evidence from this Detective Buchanan as to statements made by Barbara Stager on February 5 and April 15, 1988, is in fact admitted into evidence over the strong objections of the defendant.

The defendant argues that, by its ruling, the trial court denied her request for limiting instructions to the jury concerning the purposes for which the evidence was being admitted. The defendant contends that the failure to give such limiting instructions was error.

The admission of evidence which is relevant and competent for a limited purpose will not be held error in the absence of a request by the defendant for a limiting instruction. *State v. Jones*, 322 N.C. 406, 368 S.E.2d 844 (1988). "Such an instruction is not required unless *specifically* requested by counsel." *State v. Chandler*, 324 N.C. 172, 182, 376 S.E.2d 728, 735 (1989) (emphasis added). Prior to the trial court's ruling during the *voir dire* hearing as to the admissibility of Buchanan's testimony, counsel for the defendant did say, "I think then I am entitled to an instruction to the jury . . ."; however, counsel never specifically requested such an instruction. At the end of the argument to the trial court

on this issue, defense counsel stated, "Again, if you disagree with me and you do decide . . . to allow this in, then I would ask Your Honor for an instruction which I have prepared but I think I'm getting ahead of myself right now." Defense counsel concluded his argument, without asking for a limiting instruction, by renewing his motion *in limine* to exclude evidence of the defendant's statements concerning the death of her first husband. Thereafter, the trial court made findings and conclusions and ruled that the evidence was admissible. The jury was then returned to the courtroom.

At no time after the trial court made its ruling and the jury was returned to the courtroom did the defendant request that the trial court give the jury a limiting instruction with regard to the evidence in question. The defendant, having failed to specifically request or tender a limiting instruction at the time the evidence was admitted, is not entitled to have the trial court's failure to give limiting instructions reviewed on appeal. *State v. Short*, 322 N.C. 783, 370 S.E.2d 351 (1988); *State v. Jones*, 322 N.C. 406, 368 S.E.2d 844 (1988); N.C.G.S. § 8C-1, Rule 105 (1986 & Cum. Supp. 1990).

Finally, in support of this assignment, the defendant argues that admission of the evidence of Larry Ford's death was unfairly prejudicial in that "the probative value of the evidence did not outweigh the danger of unfair prejudice." We do not agree.

Rule 404(b) provides that evidence of prior similar acts is properly admissible so long as it is used to prove something other than the defendant's propensity or disposition to engage in like conduct. The one exception to that general rule of admissibility applies when the *only* probative value of the evidence is to show the defendant's propensity or disposition to commit offenses of the type charged. *Coffey*, 326 N.C. at 279, 389 S.E.2d at 54. Here, the trial court ruled that the evidence of Larry Ford's death was relevant and admissible as evidence tending to show intent, plan, knowledge, and absence of accident. Certainly, the evidence was prejudicial to the defendant in the sense that any evidence probative of the State's case is always prejudicial to the defendant. *Id.* at 281, 389 S.E.2d at 56. The trial court did not abuse its discretion under the balancing test of Rule 403, however, in concluding in this case that the probative value of the Ford evidence outweighed any possible unfair prejudice. *See generally State v. DeLeonardo*, 315 N.C. 762, 340 S.E.2d 350 (1986); N.C.G.S. § 8C-1, Rule 403 (1986 & Cum. Supp. 1990).

The trial court did not err in the present case by admitting the evidence concerning the death of the defendant's first husband, Larry Ford. This assignment of error is without merit.

[9] By another assignment of error, the defendant contends that the trial court erred by allowing the State to introduce and play for the jury an audiotape. That tape purportedly was made by Russell Stager three days before he died and contained his private expressions of his fear of the defendant. The defendant complains that the audiotape was not properly authenticated and was not discovered until fourteen months after Russell's death. The remarks on the audiotape included the following:

> The last few nights, during sleep, Barbara has woke me up to give me some kind of medication. I have not taken it. Last night she woke me up and gave me what she said was two aspirin but, this was like 4:30 in the morning. She stood there to see if I took it. I did not take it. I placed it under the bed. She came back to check and make sure I had taken it saying she wanted something to drink from what I was drinking. This morning, she normally is up and gone by 7:00, today at 7:00 she was still in bed. She said that she was going to go to work at 8:00. Before I got up she was over around there on the side, acts like she was looking for what I supposedly took last night. Now this was the night of January the 28th, a Thursday night. So, she stayed there looking to see if I had taken the stuff this morning. I got it out of there although she was very . . . looking very close to see if I was trying to retrieve it. She made the comment that, "You didn't take . . . those aspirins that I gave you." I said, "Yeah, I did." Well, I took the two capsules to Eckerd's Pharmacy at Forrest Hills and they said that it was sleeping pills. Now, if I was already asleep at 4:30 in the morning, *why* would somebody wake me up to give me two sleeping pills.
>
>     . . . .
>
> Barbara's second husband. The first one, I don't know what happened but according to his parents there was some foul play going on. He supposedly, accidentally shot himself in their bedroom with a pistol. Now, I have no idea what really went on, what really happened. She was there when it happened and so were the boys. My question is did her husband, Larry Ford, accidentally shoot himself.

STATE v. STAGER

[329 N.C. 278 (1991)]

(Break in tape — music)

. . . I'm just being paranoid about all this stuff. Sometimes I wonder.

(break in tape — music).

Back to Wednesday night, January the 27th. Barbara had given me something that was supposedly for sinuses and some uh . . . and some aspirin that was supposedly was Nuprin and about uh . . . 5:00 that morning I woke up and I was feeling terrible. I was hurting real bad around my eyes, my temples and I really wonder if what she gave me was sinus medicine and Nuprin. She also . . . I also had a real bad case of the cottonmouth. Even after all this, when she woke up and saw I was in Pain she actually tried to give me some more stuff which I wouldn't take.

What I would really . . . I really hope that I'm being paranoid about all this stuff that's going on but I really wonder.

(Break in tape — music)

This is uh . . . Russ Stager . . . uh . . . this is January 29th 1988, ten minutes of two.

The remaining portions of the audiotape were introduced by the defendant and contained the following:

Also at one time a few years ago I had to get a post office box because a lot of the mail coming to the house (bills and stuff) seemed to be disappearing when she got home first. Now, I've only got one key to this post office box. For the last couple of weeks every time I've turned around she's taken the key off the keyring and supposedly gone to check the mail herself. Now, a couple of months (December and January) I haven't even gotten the bill from Visa which she says she's called them and they said there's just been an uh . . . misunderstanding. I don't understand myself why a person wouldn't send the bill if they had been sending it for a year every month and not missing — why all of a sudden they would miss. Here my question is, why every time I turn around she is taking that key and running over there to check the post office box unless there's something in there she's trying to hide cause that's the reason I got the post office box to

start off with, so I would make sure I got all the mail and nothing got misplaced or destroyed.

Years ago her grandmother died. On the day of the funeral she supposedly had to go somewhere to do something. I took one of the cars to wash it. When I was coming back through after washing the car and getting it filled up, I saw our other car sitting at the county stadium out there in the parking lot all by itself, nobody around. So, I went across to the armory and sat in that parking lot waiting to see who came up. She came up with some guy. I couldn't see great but I did see that they were in the car making out and stuff like this. When I went over there in my car he took off and then she tried to put it off on me that uh . . . uh . . . I wasn't giving her affection and all this kind of stuff. Now, that's pretty strange, to be doing it on the day that they're gonna put your grandmother in the ground, in my opinion.

. . . .

When we lived on Falkirk Drive, numerous times policeman were coming over there supposedly to serve some kind of warrant on her for some bill she didn't pay. Now, that's uh . . . pretty tough considering that you're hiding that from your husband and everything which, it would be hard to hide from the law.

She also took money from WTIK when she worked there and didn't do with it what she was supposed to do with it. It was like payment but she never did the work, which I had to turn around and try and reimburse them for some of that.

Also, at uh . . . I think it's uh . . . one of the banks here in town that we tried to get a loan from knew her and because of that wouldn't even give the loan, wouldn't give me the reason why but would not give us the loan. The bank was NCNB over on uh . . . Duke Street. I still to this day don't know the reason, what she had done when she supposedly had worked there for a short time. But, her parents were sitting right in there with me and they wouldn't give us any . . . any answer why. Also at CCB and First Union at one time she had flip flopped some money that she supposedly had covered in the bank. But what she was doing was taking . . . writing a check from one bank, taking the money out

of the other bank to cover that and vice versa which obviously is not work.

Uh . . . jiggling this money back and forth was done for some car payments which really weren't being made and I had to come up with the money to pay the car off because the bank was ready to raise all kinds of cain.

She supposedly signed my name on one of the bank cards . . . but really was not my name.

The State contends that the tape recording was admissible under N.C.G.S. § 8C-1, Rule 803(3), the state of mind exception to the hearsay rule. However, the defendant argues that the evidence did not tend to show her state of mind and that the victim's state of mind was irrelevant.

Rule 803 states in part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

.   .   .   .

(3) Then Existing Mental, Emotional, or Physical Condition.—A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed . . . .

Evidence tending to show the victim's state of mind is admissible so long as the victim's state of mind is relevant to the case at hand. *State v. Meekins*, 326 N.C. 689, 695, 392 S.E.2d 346, 349 (1990). "Any evidence offered to shed light upon the crime charged should be admitted by the trial court." *Id.* at 695-96, 392 S.E.2d at 349.

Here, Russell Stager's recorded statement bears directly on his relationship with the defendant at about the time she was alleged to have killed him. Russell's statement tends to show that he was afraid of the defendant. It also tends to disprove the normal, loving relationship that the defendant contends existed between the two. Further, Russell's statement tends to refute any likelihood that he would have slept with the defendant with a loaded and cocked semi-automatic pistol under his pillow. The victim's statement, for example, that he would not take "medication" from the

STATE v. STAGER

[329 N.C. 278 (1991)]

defendant, tends to show something out of the ordinary in the marital relationship, especially given that he later took this "medication" to a pharmacy to ascertain what it was. In addition, the statement corroborates at least one motive for the murder — the defendant's borrowing money, without the victim's knowledge, which she could not repay.

The victim's recorded statement was relevant to refute the defendant's contention that the victim slept with a gun under his pillow on the night of his death, due to his fear of burglars. The victim's own recorded statement indicated that his preoccupation three days prior to his death was not fear of strangers; it was fear of the defendant. For the foregoing reasons, Russell Stager's state of mind at the time he recorded his statement tended to establish facts directly relevant to the issue of accident and to demonstrate a likelihood that his death was not an accident. The tape recording was admissible under Rule 803(3) as evidence tending to show the victim's state of mind.

The defendant also argues that even if the tape recording was admissible under Rule 803(3), its probative value was outweighed by the danger of unfair prejudice and, thus, its admission violated Rule 403. Whether to exclude evidence under Rule 403 is a matter left to the sound discretion of the trial court. *State v. Coffey*, 326 N.C. 268, 281, 389 S.E.2d 48, 54. Here, the defendant has not demonstrated any abuse of that discretion and, therefore, the trial court's ruling will not be disturbed on appeal.

The defendant also argues that the tape recording was inadmissible because it was not properly authenticated. Rule 901 of the North Carolina Rules of Evidence provides in part:

(a) *General Provision.* — The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

. . . .

(b) *Illustration.* — By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

. . . .

(5) Voice Identification. Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker.

N.C.G.S. § 8C-1, Rule 901 (1986 & Cum. Supp. 1990).

In *State v. Lynch*, 279 N.C. 1, 181 S.E.2d 561 (1971), and other cases decided prior to the adoption of the North Carolina Rules of Evidence, this Court applied a seven-pronged requirement for the admission of tape-recorded evidence. The requirements were:

(1) That the recorded testimony was legally obtained and otherwise competent;

(2) That the mechanical device was capable of recording testimony and that it was operating properly at the time the statement was recorded;

(3) That the operator was competent and operated the machine properly;

(4) The identity of the recorded voices;

(5) The accuracy and authenticity of the recording;

(6) That defendant's entire statement was recorded and no changes, additions, or deletions have since been made; and

(7) The custody and manner in which the recording has been preserved since it was made.

*Id.* at 17, 181 S.E.2d at 571. *Accord, e.g., State v. Toomer*, 311 N.C. 183, 316 S.E.2d 66 (1984) (pre-Rules case). However, since the adoption of the Rules of Evidence, we have held the admission of a tape recording found by the side of a road to be proper. *State v. West*, 317 N.C. 219, 345 S.E.2d 186 (1986). The defendant's voice on the tape recording in *West*, making certain admissions, was identified by both the victim and her mother. Citing Rule 901, this Court held that the tape recording was properly authenticated. *Id.* at 229 n.3, 345 S.E.2d at 193 n.3.

[10]  The seven-pronged test in *Lynch* has often been criticized. The Court of Criminal Appeals of Alabama, for example, has pointed out that the " 'seven-pronged test is now usually considered obsolete, even for sound recordings,' . . . and 'has been abandoned

in the better reasoned cases in favor of a rule holding that sound tapes like photographs are admissible when a witness testifies they are reliable representations of the subject sound.' " *Molina v. State*, 533 So. 2d 701, 712 (Ala. Crim. App. 1988) (citations omitted) (quoting C. Scott, *Photographic Evidence* § 1297 (Supp. 1987) ), *cert. denied*, 489 U.S. 1086, 103 L. Ed. 2d 851 (1989). We find it unnecessary, however, to weigh the merits of the seven-pronged test of *Lynch*. Instead, we conclude that the authentication requirements of Rule 901 have superseded and replaced the seven-pronged *Lynch* test. *See West*, 317 N.C. at 229-30, 345 S.E.2d at 193 (applying Rule 901 rather than the *Lynch* test). Under Rule 901, testimony as to accuracy based on personal knowledge is all that is required to authenticate a tape recording, and a recording so authenticated is admissible if it was legally obtained and contains otherwise competent evidence. 2 Brandis on North Carolina Evidence, § 195, at 132 (3d ed. 1988).

[11]   Russell Stager's parents, his sister and a coach at Durham High School all testified that they recognized the voice on the tape as Russell's voice. A nineteen-year-old Sunday school student who had been taught by the victim joined Barbara Stager's cousin, son, brothers, sister-in-law and mother in testifying that the voice on the audiotape was not Russell Stager's. The testimony of the four witnesses that the tape recording contained the voice of Russell Stager was sufficient to meet the State's burden of authentication under Rule 901. The conflict in the evidence goes to the weight and credibility of the evidence not its admissibility.

[12]   The defendant also contends that the admission of the tape recording violated her constitutional right to confrontation under both the sixth amendment to the Constitution of the United States and article I, section 23 of the Constitution of North Carolina. Both this Court and the Supreme Court of the United States have held, however, that statements falling within an exception to the general prohibition against hearsay may be admitted into evidence without violating a defendant's right to confrontation, if the evidence is reliable. *E.g., Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597 (1980); *State v. Porter*, 303 N.C. 680, 281 S.E.2d 377 (1981). Further, "a sufficient inference of reliability can be made 'without more' from the showing that the challenged evidence falls within 'a firmly rooted hearsay exception.' " *Porter*, 303 N.C. at 697 n.1, 281 S.E.2d at 388 n.1 (quoting *Ohio v. Roberts*, 448 U.S. at 66, 65 L. Ed. 2d at 608); *see State v. Faucette*, 326 N.C. 676, 392 S.E.2d 71 (1990).

The state of mind exception to the hearsay rule, one of the rules under which the victim's statement was admitted, is firmly rooted in North Carolina jurisprudence. *Faucette*, 326 N.C. at 684, 392 S.E.2d at 75; *see* 1 Brandis on North Carolina Evidence § 161 (3d ed. 1988). Therefore, there was no violation of the defendant's rights to confrontation under the state or federal constitutions in the instant case, and the defendant's argument is without merit.

[13]   Finally, with regard to this assignment of error, the defendant contends that the trial court abused its discretion in denying her pretrial and trial motions for a continuance to make an investigation concerning the tape recording and matters referred to on that recording. "A motion for continuance is within the sound discretion of the trial court and reviewable upon appeal only for abuse of discretion." *State v. Gardner*, 322 N.C. 591, 594, 369 S.E.2d 593, 596 (1988). If the motion raises a constitutional issue, the trial court's action involves a question of law which is fully reviewable upon appeal. *State v. Branch*, 306 N.C. 101, 104, 291 S.E.2d 653, 656 (1982). "The denial of a motion to continue, even when the motion raises a constitutional issue, is grounds for a new trial *only* upon a showing by the defendant that the denial was erroneous and also that his case was prejudiced as a result of the error." *Id.*

Here, the defendant has alleged no abuse of discretion other than to assert that she simply did not have enough time to investigate the tape-recorded evidence. The record reflects that the State received the tape recording on or about 19 April 1989. On 20 April the State provided a copy of the tape recording to the defendant. On 24 April the trial court ordered that funds be provided to the defendant for purposes of investigating the tape recording. On 1 May the trial court ordered the State to provide the date the tape was discovered to the defendant and also to name the persons who discovered the tape. The defendant's case was called for trial at the 1 May 1989 Criminal Session of Superior Court, Lee County. A jury was selected, and presentation of evidence commenced on 8 May 1989. On 15 May the State offered the tape into evidence.

The record reflects that the defendant produced eight witnesses who testified that the voice on the tape recording was not that of the victim. The defendant also produced a witness from Eckerd's Pharmacy at Forest Hills who testified concerning whether the victim had come into the pharmacy to have certain pills identified.

These facts tend to demonstrate that the defendant had ample time to discover and introduce evidence concerning the tape which was favorable to her case. The defendant has not shown how a continuance would have helped her in any way and has failed to show any abuse of discretion by the trial court.

For the foregoing reasons, we conclude that the trial court properly admitted the tape recording as evidence at trial. This assignment of error is overruled.

[14] By another assignment of error, the defendant argues that the trial court erred in admitting the defendant's videotaped reenactment of the shooting of her husband. We disagree.

The defendant did not object at trial to the admission of the videotape, despite being specifically asked by the trial court.

THE COURT: Well, do you oppose [the videotape] being introduced into evidence?

MR. COTTER: No, sir.

THE COURT: [The videotape] is introduced into evidence without any objections of the defendant.

The defendant's failure to object constitutes a waiver of her right on appeal to assign as error the admission of the videotape and its use during the trial. State v. Black, 308 N.C. 736, 303 S.E.2d 804 (1983); N.C.R. App. P. 10(b). The defendant knowingly waived any rights she may have had in this regard by affirmatively acquiescing to the admission of the videotape as evidence. This assignment of error is overruled.

By other assignments of error, the defendant contends that the trial court erred by admitting evidence tending to show that the defendant was racially prejudiced, that the defendant lied to her husband about a matter unrelated to the facts in issue, that the defendant intended to consult a psychiatrist after her husband's death, and that the defendant telephoned a young male several weeks after her husband's death. The defendant contends that this evidence was irrelevant and prejudicial. We disagree.

[15] Specifically, the defendant complains of Doris Stager's testimony that the defendant once said that she might change her job because "she was afraid the black lady would get the job" as her boss. Taken in context, this statement was only part

of a conversation Doris was recounting during which the defendant went over and sat next to the victim on the day before the shooting. The statement complained of was insignificant, particularly because nothing related to race was at issue in this case.

The defendant also complains about testimony concerning a telephone call she made to Chris Wagoner, a young male the victim coached. Wagoner testified that two to three weeks after the victim's death, the defendant telephoned him. She told him that she was upset because someone had parked a motorcycle in her front yard and she thought someone was running around the house. The defendant argues that the jury could find the call evidence of "suggestive behavior toward young males." A more likely inference is that the call tended to show that the victim had a legitimate fear that someone was prowling around the house. Such an inference would lend credibility to the defendant's contention that the victim placed the gun under the pillow because he was afraid of someone breaking into the house. Assuming error *arguendo*, this testimony was not prejudicial to the defendant.

[16]   In addition, the defendant complains of testimony by Doris Stager, the defendant's mother, about a conversation she had with the defendant a week after the victim's death. The defendant told Doris that she intended to start seeing a psychiatrist, but not the same psychiatrist that Doris had suggested the defendant see a few years earlier. The defendant merely argues that this testimony implicates the defendant's mental health. The most likely interpretation of this evidence is that it shows that the defendant would be seeking help to deal with the death of her husband. Assuming error *arguendo*, this testimony was not prejudicial to the defendant.

[17]   Finally, the defendant complains of the testimony of Harry Welch, the manager of WTIK radio station. Welch testified about a conversation he had had with Russell Stager in the fall of 1982. Welch testified that he told the victim that the defendant owed the radio station almost $3,000 in unearned commissions and that she had not been employed there in months. Welch testified that the victim became "very emotional and teary-eyed" when he learned that his wife was no longer working at the station. The defendant first injected the subject matter of Welch's testimony into the trial by introducing portions of the tape recording made by the victim before his death which contained matters about which Welch

testified. Thus, assuming error *arguendo*, the defendant was not prejudiced by the admission of the evidence complained of.

[18] By other assignments of error, the defendant contends that the trial court erred by admitting testimony that the defendant was calm on the morning of the victim's death and that she gave away some of his clothing on the day after his funeral. We disagree.

Opinion evidence as to the demeanor of a criminal defendant is admissible into evidence. *See State v. Moore*, 276 N.C. 142, 171 S.E.2d 453 (1970). The rule has been stated as follows:

> "The instantaneous conclusions of the mind as to the appearance, condition, or mental or physical state of persons, animals, and things, derived from observation of a variety of facts presented to the senses at one and the same time, are, legally speaking, matters of fact, and are admissible in evidence.

> "A witness may say that a man appeared intoxicated or angry or pleased. In one sense the statement is a conclusion or opinion of the witness, but in a legal sense, and within the meaning of the phrase, 'matter of fact,' as used in the law of evidence, it is not opinion, but is one of the class of things above mentioned, which are better regarded as matters of fact. The appearance of a man, his actions, his expression, his conversation — a series of things — go to make up the mental picture in the mind of the witness which leads to a knowledge which is as certain, and as much a matter of fact, as if he testified, from evidence presented to his eyes, to the color of a person's hair, or any other physical fact of like nature."

*State v. Leak*, 156 N.C. 643, 647, 72 S.E. 567, 568 (1911) (quoting J. McKelvey, Handbook of the Law of Evidence § 132 (rev. 2d ed. 1907)). This Court has consistently held that " '[t]he emotion displayed by a person on a given occasion is a proper subject for opinion testimony.' " *State v. Gallagher*, 313 N.C. 132, 136, 326 S.E.2d 873, 878 (1985) (quoting *State v. Looney*, 294 N.C. 1, 14, 240 S.E.2d 612, 619 (1978)).

Here, the testimony that the defendant was calm and was not crying described her emotional state shortly after her husband was killed, based upon the witnesses' observations of her demeanor at that time. Such evidence, and the evidence that the defendant disposed of her husband's personal effects the day after his funeral,

amounted to evidence tending to shed light upon the circumstances surrounding the killing in this case and, thus, are relevant and admissible. N.C.G.S. § 8C-1, Rules 401 and 402 (1988).

[19]   By another assignment of error, the defendant argues that the trial court erred by denying the defendant's motion to dismiss because the State's evidence was not sufficient to support a verdict convicting the defendant of the first-degree murder of Russell Stager. We disagree.

As we have stated previously,

> When a defendant moves for dismissal, the trial court is to determine only whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense. *State v. Earnhardt*, 307 N.C. 62, 65-66, 296 S.E.2d 649, 651 (1982). Whether evidence presented constitutes substantial evidence is a question of law for the court. *Id.* at 66, 296 S.E.2d at 652. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). The term "substantial evidence" simply means "that the evidence must be existing and real, not just seeming or imaginary." *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980).

*State v. Vause*, 328 N.C. 231, 236, 400 S.E.2d 57, 61 (1991). In addition, the trial court must consider such evidence in the light most favorable to the State when passing upon a defendant's motion to dismiss, allowing the State the benefit of every reasonable inference. *Id.* at 237, 400 S.E.2d at 61. "The test of the sufficiency of the evidence to withstand the defendant's motion to dismiss is the same whether the evidence is direct, circumstantial or both." *Id.* When a motion to dismiss calls into question the sufficiency of circumstantial evidence, the central issue for the trial court is "whether a reasonable inference of the defendant's guilt may be drawn from the circumstances." *Id.*

In a first-degree murder prosecution, "the trial court must determine whether the evidence, viewed in the light most favorable to the State, is sufficient to permit a jury to make a reasonable inference and finding that the defendant, after premeditation and deliberation, formed and executed a fixed purpose to kill." *Id.* at 237, 400 S.E.2d at 62. Murder in the first degree is the unlawful

killing of a human being with malice and with premeditation and deliberation. N.C.G.S. § 14-17 (1986); *see Vause*, 328 N.C. at 238, 400 S.E.2d at 62. "Premeditation" means that the defendant formed the specific intent to kill the victim some period of time, however short, before the actual killing. *Id.* "Deliberation" means that the intent to kill was formed while the defendant was in a cool state of blood and not under the influence of a violent passion suddenly aroused by sufficient provocation. *Id.* Generally, premeditation and deliberation are established by circumstantial evidence, because they ordinarily " 'are not susceptible to proof by direct evidence.' " *Id.* (quoting *State v. Love*, 296 N.C. 194, 203, 250 S.E.2d 220, 226-27 (1978) ).

The defendant argues that the evidence introduced at her trial would support no reasonable finding but that she killed her husband accidentally. She contends that the State has failed to prove that she had the requisite intent when the victim was shot. Therefore, she contends that there was no substantial evidence tending to show that the defendant's action in killing Russell Stager was intentional, premeditated or deliberated. We do not agree.

There was evidence tending to show that the defendant had control of the weapon before she discharged it, killing the victim. There was also evidence tending to show that the victim feared the defendant due to her prior actions toward him. Other evidence tended to show that the defendant gave inconsistent versions of the "accident" to Dr. Franklin Honkanen and the police, and that both of those versions were inconsistent with the physical evidence. Additionally, there was substantial evidence of motive, in the form of evidence that the defendant was the victim's sole beneficiary and would receive a very substantial sum of money at his death, that she needed money badly, and that she had been borrowing money without the victim's knowledge and concealing that fact from him. Further, the defendant's first husband had died in a manner strikingly similar to the manner in which the victim died. The trial court did not err in concluding that there was substantial circumstantial evidence tending to show that the defendant intentionally killed the victim with malice after premeditation and deliberation. Therefore the trial court did not err in denying the defendant's motion to dismiss, and this assignment of error is without merit.

[20] By another assignment of error, the defendant argues that during the capital sentencing proceeding in her case, the trial court

committed reversible constitutional error in violation of *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990), by instructing the jury that it must unanimously find the existence of a mitigating circumstance before any juror could consider that circumstance in a capital sentencing decision. The State concedes that the unanimity instruction concerning mitigating circumstances was constitutionally defective under *McKoy*, but argues that the error was harmless. We disagree.

During the capital sentencing proceeding conducted at the conclusion of the defendant's trial, the trial court gave the jury a printed form to use in recording and returning its recommendations as to punishment. The form was entitled "Issues and Recommendation as to Punishment" and contained four sections labeled "Issue One" through "Issue Four."

Issue One on the form was: "Do you *unanimously* find from the evidence, beyond a reasonable doubt, the existence of one or more of the following aggravating circumstances?" (Emphasis added.) The trial court submitted only one aggravating circumstance for the jury's consideration, "whether this murder was committed for pecuniary gain?" The jury found this aggravating circumstance to exist.

Issue Two on the form was: "Do you *unanimously* find from the evidence the existence of one or more of the following mitigating circumstances?" (Emphasis added.) The trial court submitted five possible mitigating circumstances as follows:

(1) The defendant has raised two fine children?

. . . .

(2) The defendant is an active and helpful church member?

. . . .

(3) The defendant is and has been a good friend to many people?

. . . .

(4) The defendant has no significant criminal record?

. . . .

(5) Any other circumstance or circumstances arising from the evidence which you the jury deem to have mitigating value.

**STATE v. STAGER**

[329 N.C. 278 (1991)]

The jury found circumstances one through four to exist. The jury rejected the fifth or "catchall" mitigating circumstance.

Issue Three on the form was: "Do you *unanimously* find beyond a reasonable doubt that the mitigating circumstance or circumstances found by you is, or are, insufficient to outweigh the aggravating circumstances found by you." (Emphasis added.) The jury answered in the affirmative.

Issue Four read: "Do you *unanimously* find beyond a reasonable doubt that the aggravating circumstance found by you is sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance or circumstances found by you? When making this final balance in the fourth issue *each juror* may consider *any* circumstances in mitigation that *the juror determined to exist* by the preponderance of the evidence *whether or not* that circumstance is *found to exist unanimously* by the jury in Issue 2." (Emphasis added.) The jury answered this issue in the affirmative and, thereafter, recommended that the defendant be sentenced to death.

The defendant first assigns as error that Issue Two and Issue Three on the form, and the related sentencing instructions given by the trial court, contained *McKoy* error. The State concedes that the unanimity instructions concerning mitigating circumstances set out in Issue Two and Issue Three and related oral instructions were virtually identical to the instructions found defective in *McKoy*.

In *McKoy*, the Supreme Court of the United States held unconstitutional our requirement that in capital cases jurors must unanimously agree upon the existence of a mitigating circumstance before considering it during sentencing deliberations. *See State v. McNeil*, 327 N.C. 388, 395 S.E.2d 106, *cert. denied*, --- U.S. ---, 113 L. Ed. 2d 459 (1990). As the State concedes in the case *sub judice*, the trial court instructed the jury here in the same manner found unconstitutional in *McKoy*.

The State having conceded *McKoy* error, the sole remaining issue is whether this *McKoy* error may be deemed harmless. *See State v. McKoy*, 327 N.C. 31, 394 S.E.2d 426 (1990). As the *McKoy* errors in the oral jury instructions and the written "Issues and Recommendations as to Punishment" form were of constitutional magnitude, "[t]he burden is upon the state to demonstrate beyond a reasonable doubt, that the error was harmless." N.C.G.S.

§ 15A-1443(b) (1988); *see McNeil*, 327 N.C. at 394, 395 S.E.2d at 111. On the record before us, we are forced to conclude that the State has not carried this burden.

The trial court submitted five possible mitigating circumstances: (1) that "the defendant has raised two fine children"; (2) that "the defendant is an active and helpful church member"; (3) that "the defendant is and has been a good friend to many people"; (4) that "the defendant has no significant criminal record"; and (5) any "other [mitigating] circumstance or circumstances" or "catchall" mitigating circumstance.

The jury found the first four possible mitigating circumstances to exist. Thus, if substantial evidence was introduced at trial to support a finding of any other mitigating circumstance under the "catchall," it would be difficult to say that the *McKoy* error was harmless. This is so because the erroneous unanimity requirement may have precluded a juror from weighing a circumstance which that particular juror found to exist, and thereafter concluding that all of the mitigating circumstances considered together outweighed the aggravating circumstance. *See McNeil*, 327 N.C. at 394, 395 S.E.2d at 110.

Our review of the record reveals substantial evidence from which a juror reasonably might have found the fifth or "catchall" statutory mitigating circumstance submitted to exist. For example, substantial evidence tended to show that the defendant worked with numerous young people and acted like a mother to children other than her own. Carol Galloway, a member of the defendant's church congregation, testified that the defendant would often babysit for her. The defendant would take Galloway's son to McDonald's to get a Happy Meal, buy him toys and take him to the park. Gretta Burch, a student at Wake Forest University, testified that the defendant was "like a second mom." In addition, Burch testified that the defendant had written her letters while she was away at school and that she could depend on the defendant for advice.

Further, substantial evidence tended to show that the defendant cooperated with law enforcement officials in their investigation of this case and willingly complied with all their requests. The defendant willingly reenacted on videotape her account of what happened on the day she killed her husband.

Given the evidence, we cannot conclude beyond a reasonable doubt that the constitutional error committed did not prevent one

or more of the jurors from finding the "catchall" statutory mitigating circumstance to exist and giving it mitigating value. As a result, we are unable to say beyond a reasonable doubt, particularly in light of the mitigating circumstances actually found, that an error preventing a juror from finding an additional mitigating circumstance in this case did not prevent the jury from recommending life imprisonment rather than death. *See State v. Huff*, 328 N.C. 532, 541, 402 S.E.2d 577, 582 (1991).

The State also argues that even though *McKoy* error occurred in Issues Two and Three, any error was cured by the trial court's modification to the written and oral instructions pertaining to Issue Four. The record reflects that the trial court gave an oral instruction explaining the fourth issue on the form given the jury as follows:

> In deciding this case you are not to consider the aggravating circumstances standing alone. You must consider them in connection with mitigating circumstances found by you. Again, when making this final balance in the fourth issue, each juror may consider any circumstance in mitigation that that juror determined to exist whether or not that circumstance is found to exist unanimously by the jury in issue two.

The State argues that, by the additional instruction, each member of the jury was specifically told that he or she was not precluded from considering and giving effect to a mitigating circumstance which he or she found to be shown by a preponderance of the evidence when making a recommendation as to the defendant's sentence. Thus the State contends that any *McKoy* error was harmless due to the curative instructions connected with Issue Four. We disagree for reasons substantially similar to those set forth in *Huff*, wherein we rejected a nearly identical argument. *Huff*, 328 N.C. at 541, 402 S.E.2d at 582.

The oral explanation and written modification to Issue Four, even assuming they were understood by the jury to carry the meaning now given them by the State, did not stand in isolation. " '[A] single instruction to a jury, does not stand in artificial isolation, but must be viewed in the context of the overall charge.' " *McNeil*, 327 N.C. at 392, 395 S.E.2d at 109 (quoting *Cupp v. Naughten*, 414 U.S. 141, 146-47, 38 L. Ed. 2d 368, 373 (1973) ); *see also Boyd v. United States*, 271 U.S. 104, 107, 70 L. Ed. 857, 859 (1926). The word "unanimously" or its derivatives were used no less than twenty-three times. We simply cannot conclude beyond a reasonable

doubt that the erroneous unanimity instructions given in this case did not preclude one or more jurors from finding and considering in mitigation "any other circumstances." *Huff*, 328 N.C. at 541, 402 S.E.2d at 582. Nor can we conclude beyond a reasonable doubt that had such jurors been permitted under proper instructions to consider this circumstance, they nevertheless would have voted for the death penalty rather than life imprisonment. *Id.*

For the foregoing reasons, we hold that the guilt-innocence determination phase of the defendant's trial was free from prejudicial error. However, the sentence of death must be and is vacated, and this case is remanded to the Superior Court, Lee County, for a new capital sentencing proceeding.

Guilt phase: No error. Death sentence vacated and case remanded for new capital sentencing proceeding.

Justice MEYER concurring in part, dissenting in part.

I concur in the majority's opinion as to the guilt phase, but I dissent as to the majority's conclusion that there was error in the sentencing phase requiring a new sentencing proceeding. While I concede the presence of *McKoy* error, I cannot agree with the majority's conclusion that the record reveals substantial evidence from which a juror reasonably might have found the fifth or "catchall" statutory mitigating circumstance. I am convinced that the *McKoy* error in this case was harmless beyond a reasonable doubt.

The trial court submitted to the jury one aggravating and five mitigating circumstances. The jury unanimously found the aggravating circumstance that the murder was committed for pecuniary gain. It also unanimously found four of the five mitigating circumstances: (1) "defendant has raised two fine children," (2) "defendant is an active and helpful church member," (3) "defendant is and has been a good friend to many people," and (4) "defendant has no significant criminal record." The jury did not unanimously find the existence of the final mitigating circumstance submitted, the catchall: "[a]ny other circumstance or circumstances arising from the evidence which you the jury deem to have mitigating value."

The majority finds that there was substantial evidence from which a juror might reasonably have found the "catchall" mitigating circumstance. I disagree. In order to find harmless error, this Court must find beyond a reasonable doubt that no different result would

have been reached if the individual jurors had been permitted to consider mitigating circumstances not unanimously found. *State v. Quesinberry*, 328 N.C. 288, 294, 401 S.E.2d 632, 635 (1991) (Meyer, J., dissenting). The burden is on the State to prove beyond a reasonable doubt that the jury would nonetheless have recommended death even if each individual juror had been allowed to consider all of the mitigating circumstances which he or she individually found to be present. *Id.*

My review of the evidence in this case reveals that there was little or no evidence presented to the jury by which a reasonable juror could find the "catchall" mitigating circumstance.

Defendant cites the following as possible mitigating circumstances which the jury, if properly instructed, could have found: (a) she educated, encouraged, and worked with numerous young people and acted as a mother toward children besides her own; (b) she worked most of her life to contribute to the support of her family; (c) she cooperated with state officials in investigating the case and willingly complied with their requests; and (d) she participated in charitable and community activities outside her church.

A. *Acted as a mother to other children.*

The majority, in support of this circumstance, notes that a member of defendant's church testified that defendant would often babysit for her and take her son to McDonald's and buy him toys. Additionally, a student testified that defendant had written her letters and would give her advice. This testimony tended to support no other mitigating circumstance than one which the jury found to exist, i.e., that "defendant is and has been a good friend to many people."

B. *Worked most of her life to support her family.*

A review of the record reveals that there is no evidence that defendant worked most of her life and contributed to her family's support. The evidence, in fact, shows to the contrary that defendant was continuously borrowing money.

C. *Cooperation with state officials.*

Here, the majority notes that defendant cooperated with law enforcement officials in their investigation and willingly complied by reenacting on videotape her account of what happened on the

day she killed her husband. Although defendant did voluntarily speak with law enforcement officials and cooperated in the videotaped reenactment, the evidence strongly suggests that her purpose in doing so was to mislead them as to the facts surrounding the murder.

D. *Charitable and community activities outside church.*

The record does reveal that defendant was an "active and helpful church member," a mitigating circumstance which the jury found to exist. There is no evidence in the record to suggest that defendant engaged in charitable and community activities outside of church.

Simply put, I find no evidence from which a juror reasonably might have found any of these four or any other mitigating circumstances to exist which might have been considered in the catchall. While I concede that *McKoy* error occurred during the sentencing proceeding, it was harmless beyond a reasonable doubt. I find no other error in the sentencing proceeding. The death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor and is not disproportionate to the sentence imposed in similar cases. I vote to affirm the sentence of death.