STATE OF NORTH CAROLINA v. J.C. CASTOR

No. COA01-479

(Filed 7 May 2002)

**1. Evidence— redirect examination—scope of direct examination exceeded**

The trial court did not abuse its discretion in a first-degree murder prosecution by allowing the State to elicit evidence on redirect examination that went beyond the scope of the witness's previous testimony where the testimony concerned statements by the victim which were relevant to show a bad relationship between defendant and the victim, to show motive, and to show premeditation and deliberation rather than a spontaneous act of self-defense.

**2. Evidence— residual hearsay exceptions—trustworthiness—unavailability**

The trial court in a first-degree murder case did not err by admitting statements made by a defendant's nephew to the police under the residual exceptions to the hearsay rule set forth in N.C.G.S. § 8C-1, Rules 803(24) and 804(b)(5) where defendant questioned only the trustworthiness of the statement and the unavailability of the nephew; the trial court found the statement to be trustworthy because the nephew knew the officers were investigating a murder in which he was not implicated and that his statement would incriminate his uncle, and the nephew never recanted his statement; and the court found the nephew was

unavailable because the State had made a diligent, unsuccessful effort to locate him but the nephew was secreting himself in order to avoid testifying at the trial.

**3. Evidence— 1971 conviction—admissible**

The trial court did not err in a first-degree murder prosecution by admitting evidence of defendant's 1971 second-degree murder conviction where the judge found 10 similarities between the 1971 murder and the current murder; the 27 year old murder was not too remote when the 18 years defendant spent in prison are excluded; and the probative value of the evidence far outweighs the possibility of unfair prejudice.

**4. Criminal Law— prosecutor's argument—no evidence of victim's convictions—prior motion to exclude victim's convictions**

There was no error so egregious as to be grossly improper and warrant intervention ex mero motu in a first-degree murder prosecution where the prosecutor successfully filed a motion in limine to prevent mention of the victim's criminal convictions, then argued to the jury that defendant had produced no evidence of any criminal convictions to support the claim that the victim had been a violent person. Given the evidence, there is no reasonable likelihood that a different result would have been reached had the argument not been made or had the trial court intervened ex mero motu.

Appeal by defendant from judgment entered 11 February 1999 by Judge Thomas W. Ross in Rowan County Superior Court. Heard in the Court of Appeals 14 February 2002.

*Attorney General Roy A. Cooper, III, by Special Deputy Attorney General Thomas F. Moffitt, for the State.*

*R. Marshall Bickett, Jr., for defendant-appellant.*

MARTIN, Judge.

Defendant appeals from a judgment sentencing him to life imprisonment without parole, entered after a jury found him guilty of first degree murder.

The State's evidence tended to show that the murder victim, Golden Billings and his wife, Jennifer Billings, lived in the Graystone

**STATE v. CASTOR**

[150 N.C. App. 17 (2002)]

Mobile Home Park in Rowan County in January 1998. Around 6:30 or 6:45 p.m. on 9 January 1998, Jennifer telephoned Golden's sister, Amanda Boss, and asked her to check on Golden. Jennifer told Amanda that she was concerned about Golden because he had been distraught and had taken twenty valium pills. Jennifer also told Amanda that she had been unable to reach Golden by phone. Amanda knew that Golden had been upset because his mother had died less than a month before, and he and Jennifer had been having marital difficulties. Amanda also knew that Golden had a serious drug problem, having been addicted to pain killers since his childhood bouts with polio, and that both he and Jennifer were in a methadone treatment program for their heroin addictions.

Amanda and her friend, Diane Bass, went to Golden's mobile home where they found the front door standing open, the lights on, and the curtains pulled back. Inside, Amanda found her brother sitting on the couch with his hands on his legs, and his feet on the floor. Amanda initially thought that Golden had just nodded off but then saw two gunshot wounds in his chest and realized that he was dead.

Amanda testified about a conversation she had had with Golden before he was killed. Golden had told her that he feared defendant was going to take his life because of an incident that had occurred a few months prior, involving Elic Scercy, the father of defendant's girlfriend, Tia Barringer. Elic blamed Golden for poisoning him with bad drugs and then stealing his poker winnings when paramedics rushed Elic to the hospital.

Deputy Sheriff T.A. Swing testified that Golden was found seated on the couch with his feet under the coffee table. SBI Agent William Lane, an expert in blood spatter analysis, testified that blood spatter was found on the wall directly behind, and on the ceiling directly above, where Golden had been sitting. According to Special Agent Lane, the blood spatter patterns on the wall indicated that Golden had been shot twice, with the first shot releasing a flow of blood and the second spattering the flowing blood onto the wall. Additionally, the investigating officers found no evidence of a forced entry, a struggle, or any spent shotgun shells in the home.

Dr. John D. Butts, an expert in forensic pathology, testified an autopsy revealed that Golden's death was caused by two shotgun wounds to his chest. The two shots had caused partial collapse of Golden's lungs and penetrated Golden's aorta, resulting in massive

STATE v. CASTOR

[150 N.C. App. 17 (2002)]

bleeding and death. Shotgun wadding and pellets were removed from both wounds.

The victim's wife, Jennifer, testified that earlier on the day of the murder, her husband had shot the telephone in their mobile home and had threatened to shoot himself. Jennifer testified that on the evening of 9 January 1998, defendant and his girlfriend, Tia Barringer, came to her home. Jennifer and Tia left Golden and defendant in the living room while they went into the bedroom to talk. Jennifer informed Tia that she wanted to leave Golden and began gathering her clothes and other items to take with her. Jennifer heard two gunshots. While she and Tia were in the bedroom, Jennifer had not heard any argument, threats, or sounds of a fight or scuffle. After hearing the shots, Jennifer rushed into the living room to find her husband sitting on the couch with a hole in his chest and defendant going out the door. Jennifer testified that there was no weapon in Golden's hands, on the floor, or on the coffee table in front of him. Tia went to the couch and removed a 9 mm pistol from the back of Golden's trousers. Jennifer quickly finished gathering her clothes and ran out the door. By that point, defendant was already in the driver's seat. Jennifer and Tia got into the car and the three of them drove to Kannapolis, where they dropped defendant off at a church. Prior to defendant getting out of the car, Jennifer saw a sawed off shotgun in defendant's lap and saw defendant wiping the gun down or wrapping it up in a sheet. After defendant got out, Tia drove until the car ran out of gas shortly thereafter. Jennifer and Tia then walked to defendant's sister's house to look for defendant. When they found that defendant was not there, they left.

Defendant, Jennifer, and Tia were soon reunited back at the car. Someone eventually stopped and helped them obtain some gasoline. Tia then drove defendant and Jennifer to Elic Scercy's house and left Jennifer there. From Elic's house, Jennifer called her house several times at defendant's suggestion so that it would not look as if she already knew her husband was dead. Jennifer also called Amanda Boss because she wanted somebody to go to the house and find her husband.

Tia Barringer testified that in January 1998 she and defendant were living together in Kannapolis. A few days prior to Golden's death, Tia had been in a traffic accident and was arrested for drunk driving, hit and run, and careless and reckless driving. Tia gave the Kannapolis police officers a false identification. Tia made bond 8 January 1998 and Tia and defendant decided to go to South Carolina

STATE v. CASTOR

[150 N.C. App. 17 (2002)]

before the police found out about the false identification and came to arrest her. They stopped by Golden's house to get some drugs on the way out of town on 9 January 1998.

Tia testified that when she and defendant arrived at Golden's trailer, Golden motioned them inside. Jennifer was upset and crying. While Tia and Jennifer were in the back bedroom talking, Jennifer told Tia that Golden had been mistreating her and that she wanted to leave him. Tia stated that a few minutes later, they heard two gun shots and that her "first thought was it was Goldie's gun because Jennifer said he'd been shooting up the house." Tia even stated "that's Goldie's gun" when she heard the shots. After running to the living room, Tia saw Golden on the couch with blood on his shirt and then removed the gun from the back of his pants, put it in her purse and left. On the way to Kannapolis, Tia testified that she heard defendant say, "that son of a bitch pulled a gun on me." After defendant and Tia dropped Jennifer off at Elic Scercy's home, they went to a friend's house. Tia drank until she passed out and when she came to, the pistol that she had taken from Golden was missing from her purse. She asked defendant what had happened to it and he told her that he had sold it.

Janie Cook, defendant's sister, testified that on the evening of 9 January 1998 defendant went to her house in Kannapolis looking for someone to help him fix his car. Janie testified that she did not see any weapon on defendant's person. However, she saw defendant pull several shotgun shells from his coat pocket and wipe them with a kitchen towel. Janie provided a bag into which defendant put the shotgun shells. The next day, SBI Agent Gale found a white Eckerd's drug prescription bag, one spent shotgun shell, and five unfired shotgun shells along the road near Janie's house.

SBI Agent Eugene Bishop, an expert in the field of forensic firearm and tool mark identification, examined wadding and shotgun pellets that were removed from Golden's body. Bishop additionally examined the six shotgun shells found near Janie's house. Bishop testified that the waddings were consistent with having come from 12-gauge Remington Peters and Winchester AA shotgun shells. Bishop further testified that for the wadding to have been forced into Golden's chest, the shotgun would have to have been fired at close range. According to Bishop, five of the shotgun shells found near Janie's house were 12-gauge birdshot shells and the sixth was a 12-gauge buckshot shell.

The trial court also admitted into evidence a statement made by Janie Cook's son, Kenneth Gabriel, to Sergeant Agner of the Rowan County Sheriff's Office on 10 January 1998, the day following Golden Billings' death. In the statement, Kenneth Gabriel stated that after defendant had left his mother's house on 9 January 1998, he found defendant near the church where defendant's car had run out of gas. Defendant had blood on his hands and had a sawed-off shotgun with a pistol grip concealed under his coat, which Kenneth saw when defendant was removing cigarettes from his jacket. Kenneth also said that he had seen several shotgun shells drop out of defendant's jacket pocket; defendant picked the shells up off the ground.

The State also offered evidence tending to show that defendant had killed Pearl Walker on 25 June 1971 by shooting her with birdshot from a 12-gauge shotgun, and had been convicted of second degree murder.

Defendant testified in his own defense, claiming that he had killed Golden Billings in self-defense. Defendant testified that when he and Tia arrived at Golden's home, Jennifer was crying and blood was running out of the corner of her mouth. Defendant stated that he and Golden stayed in the living room while Tia and Jennifer went into another room to talk. According to defendant, he was not high on drugs at the time of his visit to Golden's home, even though he had taken some prescription painkillers that day. Defendant also testified that there were no hard feelings between Golden and himself. Defendant admitted that he had taken a sawed-off shotgun, concealed under his coat, into Golden's trailer. Defendant testified that he had been carrying the gun for protection since he was beaten with a ball bat in 1997.

Golden told defendant that he and Jennifer had been fighting that day and that he wanted Jennifer to leave. Golden told defendant that he was tired of people, particularly Tia, interfering in his marriage. After sensing that Golden was becoming antagonistic, defendant told Tia that it was time for them to leave. According to defendant, at that point Golden pulled out his 9 mm pistol and chambered a round. Defendant did not pull his gun out nor make any other overt act towards defendant at that time. Defendant was anxious because he knew Golden was "messed up" and was upset with Jennifer. Defendant had also seen Golden shoot and stab people in the past when he was "messed up." Golden eventually put the pistol away. As Tia entered the living room, defendant stated that it appeared to him

that Golden was reaching for his pistol so he told Tia to get back and he shot Golden. Defendant testified that he only pulled the trigger once but both barrels discharged simultaneously. Defendant acknowledged that he had not actually seen the pistol in Golden's hand at the time he pulled the trigger.

Several witnesses testified that Golden Billings was a violent man. Phillip Frye testified that two years earlier, he had gotten into a fight with Golden. After the altercation, Phillip went to another trailer and fell asleep. Phillip awoke to find Golden standing over him. Golden shot Phillip four times and then hit Phillip in the head with the gun and fled the scene. Phillip admitted on cross-examination that he refused to press charges against Golden and that he told the police another man had shot him.

Eric Black also testified that Golden Billings had a reputation for violence. On 8 January 1998, Eric and Kimberly Hardy saw Golden at a convenience store. Eric and Kimberly followed Golden to his trailer where they drank and used drugs. On this same evening, Golden and Jennifer got into an argument and Golden pulled out a 9 mm pistol, waved it around, and then pointed it at Jennifer's head. Defendant's step-son, Terry Bunn testified that Golden had a bad reputation for violence and "was probably the meanest little man around."

---

Rule 10(c)(1) of the North Carolina Rules of Appellate Procedure requires that "clear and specific record or transcript references" be included in assignments of error in the record on appeal. N.C.R. App. P. 28(b)(5) requires that immediately following each question presented in the appellant's brief "shall be a reference to the assignments of error pertinent to the question, identified by their numbers and by the pages at which they appear in the printed record on appeal." Defendant's counsel has complied with neither rule. The Rules of Appellate Procedure are designed to facilitate effective appellate review; they are mandatory and a failure to follow the Rules subjects an appeal to dismissal. N.C.R. App. P. 25(b). In the exercise of the discretion granted us by N.C.R. App. P. 2, however, we will suspend the requirements of these rules in the present case and consider the merits of defendant's arguments.

[1] By his first assignment of error, defendant contends the trial court erred by allowing the State to elicit testimony from a witness on redirect examination that went beyond the scope of the witness' testimony during direct and cross-examination. Specifically, defendant

objects to Amanda Boss's testimony concerning statements the murder victim made to her, shortly before his death, expressing his fear that defendant was going to kill him. The trial court ruled, over defendant's objection, that the murder victim's statements made to Amanda were admissible "to show the present state of mind of the alleged victim as one being in fear of [defendant]" under Rule 803(3) of the North Carolina Rules of Evidence and instructed the jury that it could consider the statements solely for that purpose. Amanda testified that the murder victim told her six to eight weeks before his death that he feared defendant was going to kill him because Elic Scercy, father of defendant's girlfriend, believed that Golden had tried to poison him by giving him contaminated drugs and then stole his money while he was sick. Defendant cross-examined Amanda concerning these statements.

A party ordinarily may not question a witness on entirely new matters on redirect examination. *State v. Weeks,* 322 N.C. 152, 367 S.E.2d 895 (1988). However, a trial judge has discretion to allow testimony on redirect examination that exceeds the scope of direct and cross-examination provided the testimony is relevant and otherwise admissible. *State v. Barton,* 335 N.C. 696, 441 S.E.2d 295 (1994); *see* N.C. Gen. Stat. § 8C-1, Rule 611(a) (1999) ("The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence . . . .) and N.C. Gen. Stat. § 15A-1226(b) (1999) ("The judge in his discretion may permit any party to introduce additional evidence at any time prior to verdict.")

"Evidence tending to show a presently existing state of mind is admissible if the state of mind sought to be proved is relevant and the prejudicial effect of the evidence does not outweigh its probative value." *State v. Locklear,* 320 N.C. 754, 760, 360 S.E.2d 682, 685 (1987). A murder victim's statements, made shortly before his death in which he expressed fear that the defendant was going to kill him have been held admissible under the state of mind exception to the hearsay rule to show the status of the victim's relationship to the defendant prior to the killing. *See, e.g., State v. Crawford,* 344 N.C. 65, 472 S.E.2d 920 (1996); *State v. Burke,* 343 N.C. 129, 469 S.E.2d 901, *cert denied,* 519 U.S. 1013, 136 L. Ed. 2d 409 (1996); and *State v. Alston,* 341 N.C. 198, 461 S.E.2d 687 (1995), *cert. denied,* 516 U.S. 1148, 134 L. Ed. 2d 100 (1996). A victim's statements have also been held admissible under the state of mind exception to establish the defendant's motive for murder. *See, e.g., State v. Miller,* 344 N.C. 658, 477 S.E.2d 915 (1996).

In the present case, the victim's statements were relevant to show that the relationship between defendant and Golden was not a good one, and to show that defendant had a motive for the killing, i.e., revenge for poisoning Elic Scercy and stealing his money. Finally, the victim's statements of fear were also relevant upon the issue of whether the killing was a deliberate premeditated act rather than a spontaneous act done in self-defense. The probative value of such testimony outweighed any potential prejudice to defendant. Thus, we hold the trial judge did not abuse his discretion in permitting the prosecutor to admit testimony on redirect examination concerning the victim's fear that defendant was going to kill him.

[2] By his second assignment of error, defendant argues the trial court erred in allowing the hearsay statement of Kenneth Gabriel into evidence. On 10 January 1998, Kenneth gave police officers a signed statement describing his encounter with defendant on the night of the alleged murder. After repeated unsuccessful attempts to secure Kenneth's presence at trial to testify, the prosecutor moved to introduce the written statement under one or both of the residual exceptions to the hearsay rule. N.C. Gen. Stat. § 8C-1, Rules 803(24) and 804(b)(5). Following a *voir dire* hearing, the trial judge made findings of fact and conclusions of law and ruled the statement admissible. Defendant contends the ruling was error.

There is no question that the testimony in dispute here was "hearsay" since it was "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801(c). Our Supreme Court has set forth six requirements which must be met for a hearsay statement to be admissible under Rule 803(24) where the availability of the declarant is immaterial: (1) the proponent must notify his adversary in writing of his intent to introduce the statement; (2) the statement must not be admissible under any of the listed hearsay exceptions; (3) the statement must possess circumstantial guarantees of trustworthiness equivalent to those of the listed exceptions; (4) the statement must be offered as evidence of a material fact; (5) the statement must be more probative on the point for which it is offered than other evidence which the proponent can produce through reasonable efforts; and (6) the general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence. *State v. Smith*, 315 N.C. 76, 337 S.E.2d 833 (1985). The Court has also held that for a hearsay statement to be admissible under Rule 804(b)(5), where the availabil-

ity of the declarant is material, the same six requirements must be met after the proponent first proves that the declarant is unavailable. *State v. Triplett*, 316 N.C. 1, 340 S.E.2d 736 (1986).

Although defendant discusses the various requirements for admissibility under the residual exceptions to the hearsay rule, he specifically questions only the trustworthiness of Kenneth Gabriel's statement and Kenneth Gabriel's unavailability. Therefore, we will only address these two issues.

The trial judge made specific findings of fact and conclusions of law relating to both the trustworthiness of Kenneth's statements and to his unavailability to testify at trial. Those findings are amply supported by evidence presented during the *voir dire* hearing, and therefore, are conclusive and binding on appeal. *See State v. Parker*, 350 N.C. 411, 516 S.E.2d 106 (1999), *cert. denied*, 528 U.S. 1084, 145 L. Ed. 2d 681 (2000).

In determining whether a hearsay statement is trustworthy under the residual hearsay exceptions, our Supreme Court has directed trial judges to consider the following factors:

> (1) assurance of personal knowledge of the declarant of the underlying event; (2) the declarant's motivation to speak the truth or otherwise; (3) whether the declarant ever recanted the testimony; and (4) the practical availability of the declarant at trial for meaningful cross-examination.

*Smith*, 315 N.C. at 93, 337 S.E.2d at 845 (citations omitted).

As to the trustworthiness of Kenneth's statement, the trial judge found that Kenneth was interviewed while seated in a law enforcement vehicle. Additionally, Kenneth stated that he had seen defendant carrying a sawed-off shotgun with a black pistol grip and a strap which went over defendant's shoulder the night before. When Kenneth made his statement, he knew that the officers were investigating a homicide in which he was not implicated and that his statement would incriminate defendant, his uncle. Under these circumstances, the trial judge concluded that the testimony bore circumstantial guarantees of trustworthiness. The statement described an event about which Kenneth had first-hand knowledge. Further, Kenneth had no motive to lie to the police since he was providing information that was adverse to the interests of his relative and he was not trying to evade any personal responsibility for the crime. The trial judge also found that there was no evidence that Kenneth ever

recanted his statement. Finally, the trial judge found that "there is no practical availability of [Kenneth] at the trial for purposes of meaningful cross examination since he is unavailable and the Court has so found and concluded."

As to the unavailability of Kenneth to testify at trial, the trial judge concluded that the State made

> every diligent effort to locate [Kenneth] and make the witness available for cross examination; . . . [and that] the evidence shows . . . [Kenneth] is specifically secreting himself and avoiding appearance before the Court in testifying, and that the Court would conclude he is an unavailable witness.

These conclusions were supported by detailed findings of fact. The trial judge found that a subpoena had been issued at the prosecutor's request to compel Kenneth's appearance at trial. The subpoena was left in the hands of Kenneth's mother, Janie Cook, who stated that Kenneth was in the bathroom when the deputy arrived to serve him, and said she would give the subpoena to him. Subsequently, Detective Linda Porter recovered the subpoena, believing that it had not been properly served. Law enforcement officers tried to locate Kenneth by contacting his probation officer and his Department of Social Services (DSS) caseworker. According to his probation officer, there was an outstanding warrant for Kenneth's arrest for a probation violation. Kenneth's DSS caseworker had not seen him recently. Officers also contacted Kenneth's girlfriend and the Kannapolis Police Department for assistance in finding Kenneth but were again unsuccessful. Kenneth's mother, Janie Cook, had spoken with Kenneth by telephone the day before the trial, but he refused to tell her where he was. These findings of fact are supported by evidence presented during the *voir dire* hearing.

We hold that the trial judge properly applied the requirements of Rules 803(24) and 804(b)(5) and correctly ruled that Kenneth's statement was admissible thereunder. This assignment of error is overruled.

[3] Defendant next assigns error to the trial court's admission of evidence that defendant had been convicted of second degree murder for shooting Pearl Forney Walker with a 12-gauge shotgun in 1971. Following a *voir dire* hearing, the trial judge ruled, over defendant's objection, that this evidence was admissible under G.S. § 8C-1, Rule 404(b) as relevant to defendant's intent to kill and defendant's iden-

tity as the perpetrator of the murder in the instant case. Defendant argues the evidence of the 1971 murder should have been excluded because it was too remote in time and insufficiently similar to be relevant, and, even if admissible under Rule 404(b), the evidence was so prejudicial that it should have been excluded under G.S. § 8C-1, Rule 403. We reject defendant's argument.

Generally, under Rule 404(b), evidence of other crimes, wrongs, or acts is admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident." N.C. Gen. Stat. § 8C-1, Rule 404(b). It is well established that Rule 404(b) is a rule of

> *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged.

*State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990). Therefore, evidence of bad conduct and prior crimes is admissible under Rule 404(b) "as long as it is relevant to any fact or issue other than the defendant's propensity to commit the crime." *State v. White*, 340 N.C. 264, 284, 457 S.E.2d 841, 853, *cert. denied*, 516 U.S. 994, 133 L. Ed. 2d 436 (1995).

However, such evidence must be "sufficiently similar and not so remote in time as to be more probative than prejudicial under the balancing test of [ ] Rule 403." *State v. Boyd*, 321 N.C. 574, 577, 364 S.E.2d 118, 119 (1988). Our Supreme Court has explained that a crime or bad act is similar under Rule 404(b) if there are " 'some unusual facts present in both crimes or particularly similar acts which would indicate that the same person committed both,' " but the similarities between the two situations do not have to "rise to the level of the unique and bizarre." *State v. Green*, 321 N.C. 594, 603-04, 365 S.E.2d 587, 593, *cert. denied*, 488 U.S. 900, 102 L. Ed. 2d 235 (1988) (quoting *State v. Riddick*, 316 N.C. 127, 133, 340 S.E.2d 422, 426 (1986)). Further, remoteness in time is more significant when a prior crime is used to prove a common scheme or plan but less significant when used to prove intent. *State v. Stager*, 329 N.C. 278, 307, 406 S.E.2d 876, 893 (1991). In the later instance, "remoteness in time generally affects only the weight to be given such evidence, not its admissibility." *Id.*

STATE v. CASTOR

[150 N.C. App. 17 (2002)]

The trial judge in the case *sub judice* made extensive findings of fact and conclusions of law. He found the following similarities between the murders of Pearl Walker in 1971 and Golden Billings in 1998: (1) both victims died from a shotgun wound to the upper torso; (2) both victims were shot with 12-gauge shotguns; (3) both victims were shot at such close range that the waddings from the shotgun shells were embedded in their wounds; (4) relatively fine shot was found in both victim's bodies; (5) the murder weapons in both instances were never found and there was some evidence that the weapons were disposed of; (6) defendant was alone in a room with each of the victims when they were shot; (7) both victims were killed in their own homes; (8) in both instances co-defendants were involved but were not present in the room when defendant shot the victims; (9) defendant made efforts in both instances to avoid leaving his fingerprints by wiping off the murder weapon or taping his fingertips; and (10) in both instances defendant fled from North Carolina and was captured out-of-state. These findings are supported by the evidence and disclose sufficient similarities between the two killings to render evidence of the earlier murder of Pearl Walker admissible.

The trial judge also addressed the issue of remoteness. He found that during the twenty-seven year period between the two killings, defendant spent approximately eighteen years in prison. This Court has stated that "[i]t is proper to exclude time defendant spent in prison when determining whether prior acts are too remote." *State v. Berry*, 143 N.C. App. 187, 198, 546 S.E.2d 145, 154, *disc. review denied*, 353 N.C. 729, 551 S.E.2d 439 (2001). As noted above, remoteness in time generally affects only the weight to be given evidence of a prior crime and not its admissibility when such evidence is being used to show intent, motive, knowledge, or lack of accident rather than to show that both crimes arose out of a common scheme or plan. *Stager*, 329 N.C. at 307, 406 S.E.2d at 893. We hold the evidence of defendant's 1971 shooting of Pearl Walker was not so remote in time, nine years excluding the eighteen years defendant was imprisoned, as to render it inadmissible. *See State v. Murillo*, 349 N.C. 573, 509 S.E.2d 752 (1998), *cert. denied*, 528 U.S. 838, 145 L. Ed. 2d 87 (1999) (twenty-two years not too remote); *State v. White*, 340 N.C. 264, 457 S.E.2d 841, *cert. denied*, 516 U.S. 994, 133 L. Ed. 2d 436 (1995) (nineteen years not too remote).

Finally, as to this third assignment of error, although the evidence was harmful to defendant's case, its probative value upon the issues

for which it was offered, defendant's intent to kill and his identity as the perpetrator, far outweighed the possibility of unfair prejudice. Therefore, we conclude that the trial court did not err in admitting the evidence pursuant to Rules 404(b) and 403.

**[4]** By his fourth and final assignment of error, defendant argues the trial judge erred in not preventing the prosecutor from arguing to the jury that defendant had produced no evidence of any criminal convictions to support his claim that the deceased victim was a mean and violent person. Defendant contends the prosecutor's argument was improper since the prosecutor had filed a motion *in limine* to prevent defendant from mentioning Golden Billings' prior criminal convictions, and the trial judge had allowed the motion, ordering:

> the defendant and his counsel and witnesses not to mention or inquire into any prior criminal activity of the victim . . . except that activity for which the door may be opened by the State's own evidence.

Defendant failed to object at trial to the prosecutor's jury argument of which he now complains and the trial court did not intervene *ex mero motu*. Defendant now argues that the prosecutor's comments during closing argument that defendant had not produced any evidence showing that Golden had been convicted of a violent crime was so grossly improper as to require the trial court's intervention, and, failing such intervention, as to entitle him to a new trial. We disagree.

Arguments of counsel are left largely to the control and discretion of the trial judge, and counsel is allowed wide latitude in the argument of hotly contested cases. *State v. Williams*, 317 N.C. 474, 346 S.E.2d 405 (1986). When a defendant fails to object to the arguments at trial, he must establish that the remarks were so grossly improper that the trial judge abused his discretion by failing to intervene *ex mero motu*. *State v. Rose*, 339 N.C. 172, 202, 451 S.E.2d 211, 228-29 (1994), *cert. denied*, 515 U.S. 1135, 132 L. Ed. 2d 818 (1995). To establish such abuse, defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair. *Id.*

Even if we were to hold that the prosecutor's argument with respect to the absence of evidence of Golden's convictions was improper in light of the motion *in limine* and the trial court's ruling thereon, they were not so egregious as to be grossly improper and

warrant intervention *ex. mero motu* by the trial court. In light of the evidence presented at defendant's trial, we do not believe there is any reasonable likelihood that a different result would have been reached had the argument not been made or had the trial court intervened, *ex mero motu*, to stop the argument. Therefore, we hold defendant's right to a fair trial was not compromised, and defendant's assignment of error is overruled.

Defendant received a fair trial, free from prejudicial error.

No error.

Judges HUDSON and CAMPBELL concur.